904 A.2d 557

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Quinton Delmer ROBERTS.**

**Misc. AG No. 35, Sept. Term, 2005.**

Court of Appeals of Maryland.

Aug. 3, 2006.

138

140

Fletcher P. Thompson, Assistant Bar Counsel Attorney Grievance Commission of Maryland, for petitioner.

Anthony M. Conti, Baltimore, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, J.

The Attorney Grievance Commission of Maryland ("the Commission"), the Petitioner, by Bar Counsel acting pursuant to Maryland Rule 16–751,[1] filed a Petition For Disciplinary Or Remedial Action against Quinton Delmer Roberts, Respondent. The petition charged that Respondent violated Rules 1.1 (Competence),[2] 1.2 (Scope of Representation),[3] 1.3 (Dili-

---

1. Maryland Rule 16–751 provides in relevant part:
 (a) **Commencement of disciplinary or remedial action.** (1) Upon approval of Commission. Upon approval or direction of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

2. Maryland Rule 1.1 provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

3. Rule 1.2 provides:
 (a) A lawyer shall abide by a client's decisions concerning the objec-

gence),[4] 1.4 (Communication),[5] 1.15 (Safekeeping Property),[6]

tives of representation, subject to paragraphs (c), (d) and (e), and, when appropriate, shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

(b) A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social or moral views or activities.

(c) A lawyer may limit the objectives of the representation if the client consents after consultation.

(d) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.

(e) When a lawyer knows that a client expects assistance not permitted by the Rules of Professional Conduct or other law, the lawyer shall consult with the client regarding the relevant limitations on the lawyer's conduct.

Effective July 1, 2005, the format of Rule 1.2 was changed, eliminating subsection (e), and was modified as follows:

(a) Subject to paragraphs (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of the representation and, when appropriate, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

4. Rule 1.3 requires "[a] lawyer [to] act with reasonable diligence and promptness in representing a client."

5. Rule 1.4 states:

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Effective July 1, 2005, the format of Rule 1.4(a) was modified as follows:

(a) A lawyer shall:

*　*　*　*　*　*

(2) keep the client reasonably informed about the status of the matter;

(3) promptly comply with reasonable requests for information. . . .

*　*　*　*　*　*

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

6. Rule 1.15, in relevant part, provides:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

Effective July 1, 2005, the format of Rule 1.15 was modified as follows:

(b) A lawyer may deposit the lawyer's own funds in a client trust account for the sole purpose of paying bank service charges on that account, but only in an amount necessary for the purpose.

(c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, a lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred.

(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the

and 8.4 (Misconduct) [7] of the Maryland Rules of Professional Conduct (MRPC), as adopted by Rule 16–812. Bar Counsel also alleged that Respondent violated Maryland Rule 16–609 (Prohibited Transactions) [8] and Md.Code (1989, 2004 Repl.Vol. & 2005 Supp.), § 10–306 of the Business Occupations and Professions Article.[9]

On August 12, 2005, pursuant to Rule 16–752(a),[10] we referred this case to the Honorable Carol E. Smith of the

client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(e) When in the course of representation a lawyer is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved. The lawyer shall promptly distribute all portions of the property as to which the interests are not in dispute.

7. The relevant portions of Rule 8.4 state that it is professional misconduct for a lawyer to:

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [and]

(d) engage in conduct that is prejudicial to the administration of justice[.]

8. Rule 16–609 provides:

An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer.

9. Section 10–306 provides that "A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer."

10. Rule 16–752(a) provides:

(a) **Order.** Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing.

Circuit Court for Baltimore City, to conduct a hearing and make findings of Fact and Conclusions of Law. The hearing commenced on December 20, 2005, but was continued as a result of an extension granted to Petitioner by this Court, and was concluded on January 9, 2006. After reviewing all arguments and evidence presented in this case by both parties, the hearing court concluded that Respondent violated Rules 1.3, 1.15(a) and (b), and 8.4(c) and (d) of the MRPC; Maryland Rule 16–609; and Md.Code (1989, 2004 Repl.Vol. & 2005 Supp.), § 10–306 of the Business Occupations and Professions Article.

The court, pursuant to Rule 16–757(c),[11] found the following facts by the clear and convincing standard, which we have summarized:

Quinton D. Roberts, graduated in May 1999 from the College of William & Mary Marshall–Wythe School of Law and was admitted to the practice of law in Maryland on December 16, 1999. Respondent worked as an associate for the law firm of Piper & Marbury at its Baltimore office from September 1999 until March 2001, and practiced in the securities department. Respondent left Piper & Marbury in March 2001 and from that date through July 2005, Respondent worked in Baltimore as a solo practitioner under the trade name Roberts Law Group, LLC ("RLG"). Respondent has worked for the Office of the Public Defender for Prince George's County since August 2005.

Respondent was retained by Ronald Huggins on December 17, 2002, to recover damages for injuries sustained in an

---

11. Maryland Rule 16–757(c) provides:

(c) **Findings and conclusions.** The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. If dictated into the record, the statement shall be promptly transcribed. Unless the time is extended by the Court of Appeals, the written or transcribed statement shall be filed with the clerk responsible for the record no later than 45 days after the conclusion of the hearing. The clerk shall mail a copy of the statement to each party.

automobile accident. The terms of the original fee agreement between Respondent and Mr. Huggins stated that Respondent was to receive one-third of the gross settlement amount. Respondent settled Mr. Huggins's case with the insurance company of the at-fault driver for $7,500 in June 2004. Subsequently, Respondent received a settlement check for $7,500 that was made payable both to himself and to Mr. Huggins on June 19, 2004. Respondent and Mr. Huggins then had a meeting at Respondent's office on June 21, 2004, at which time Mr. Huggins endorsed the settlement check and was told by Respondent that the check would be deposited into Respondent's Trust Account. Respondent indicated that he disbursed the funds from the settlement when the check cleared. On that same day, Respondent gave Mr. Huggins a settlement statement stating that the $7,500 gross settlement amount would be divided in the following manner: Respondent was to receive $2,500, plus $18 for expenses; the two medical providers were owed a combined total of $4,178; and Mr. Huggins would receive $804. Mr. Huggins also signed a release of claim during the meeting. Following this meeting, Respondent did not contact Mr. Huggins until sometime during the second half of July 2004.

Following his meeting with Mr. Huggins, Respondent deposited the settlement check into his Trust Account at Bank of America N.A., and the next day transferred the entire $7,500 from his Trust Account into his Operating Account at the same bank. The funds from the settlement due to Mr. Huggins and his medical providers were not disbursed during June, July, August, or September 2004. Respondent traveled to Michigan on June 23, 2004, where he was married on June 26. On or about July 4, 2004, Respondent returned to Maryland with his new wife and stepdaughter. Respondent advised Mr. Huggins that he would attempt to seek reductions in the amounts claimed by the medical providers during the second half of July 2004.

Mr. Huggins contacted Respondent on or about September 16, 2004, and expressed frustration because he had not yet been paid any of the settlement funds. Respondent met with

Mr. Huggins at Respondent's office on September 20, 2004. At that time, Respondent planned to pay Mr. Huggins $1,000 from the settlement.[12] Before the meeting, Respondent phoned Mr. Huggins and informed him that they would have to reschedule the meeting because there had been a fire at his office building. Respondent subsequently asked Mr. Huggins to pick up the $1,000 check from one of the Respondent's colleagues later that evening. Mr. Huggins, however, was unable to make the meeting.

Mr. Huggins filed a complaint with the Commission on September 22, 2004, in connection with Respondent's failure to pay the funds owed to Mr. Huggins from the personal injury settlement. Mr. Huggins met with Respondent on October 16, 2004, at Respondent's office, and during that meeting Respondent gave Mr. Huggins a new Statement of Settlement that included the following revised figures: Respondent had reduced his fee from $2,500 to $2,211; the total combined amount due to the medical providers was reduced from $4,178 to $3,771; and the amount due to Mr. Huggins increased from $804 to $1,500. Respondent indicated in the Statement of Settlement that he would disburse Mr. Huggins's net payment of $1,500 in the form of two checks: RLG Check # 640, and RLG Check # 645. During that meeting, Respondent presented Mr. Huggins with two disbursement checks written on Respondent's Operating Account. Check # 640 was made out for $1,000 and Check # 645 was postdated for November 16, 2004, and made out for $500.

At the meeting, Mr. Huggins also signed a letter indicating that Mr. Huggins was satisfied with Respondent's services and that Mr. Huggins was withdrawing his complaint with the Commission. On or about October 26, 2004, Mr. Huggins attempted to cash both disbursement checks at Bank of America. Mr. Huggins was able to cash the $1,000 check, but

12. The amount due to Mr. Huggins, as noted in the settlement statement from the June 21, 2004, meeting, stated that Mr. Huggins would receive $804. As the hearing court noted, Respondent provided no explanation for the increase to a $1,000 disbursement amount.

unable to cash the $500 check because it was postdated. Respondent had not informed Mr. Huggins that the $500 check was postdated.

Regarding the balances in Respondent's Trust and Operating Accounts, examination of the Bank of America records admitted into evidence demonstrated the tenuous financial state of Respondent's practice at the time that Respondent transferred the $7,500 from his Trust Account into his Operating Account. As the hearing court found, on June 1, 2004, Respondent's Operating Account had a balance of $148 and which became a negative balance on June 2, 2004. Respondent's Operating Account had a negative balance for the entire period from June 2–21, 2004, including a balance of -$536 immediately prior to the transfer of Mr. Huggins's settlement funds from the Trust Account on June 22. The only exception to the period in which the account had a negative balance was June 7–10, when the account had a positive balance. Bank of America charged Respondent 12 separate overdraft fees on his Operating Account between June 2 and June 22, 2004. Respondent's Operating Account balance fell to $4,964 on June 25 and was $3,181 at the end of June 2004.

Even if the balances in Respondent's Trust and Operating Accounts are added together, he generally failed to maintain the portion of the settlement proceeds that rightfully belonged to Mr. Huggins and to the medical providers during the period from June 22 through October 16, 2004. There was also considerable activity in Respondent's Operating Account.

The hearing court found, based on these records, and by clear and convincing evidence, that Respondent was capable of paying the full $4,982 owed to Mr. Huggins and the medical providers for only six days out of the entire period from June 22 through October 16, 2004. From June 22–24, and from October 1–3, 2004, Respondent's Operating Account balance was above $4,982. At all other times, Respondent's Operating Account balance was less than $4,982, while his Trust Account balance remained unchanged at $20 during the same period of time.

While in solo practice from March 2001 through July 2005, Respondent did not maintain any other written records or ledger cards that detailed the client funds that were being held in trust. Respondent instead relied only on Bank of America account statements as his record-keeping system for client trust funds. When he opened his Trust Account, Respondent did not request check-writing authority. It was Respondent's normal business practice to transfer funds from his Trust Account into his Operating Account, where he did have check-writing authority. Respondent stated that his reasons for engaging in this practice were that, "at the time that [he] opened both his Trust and Operating Accounts with Bank of America N.A., bank officials did not inform him that he needed to have check-writing authority for his Trust Account." Respondent was also not aware that transferring escrow funds into his Operating Account might violate the MRPC. The hearing court concluded that Respondent clearly and "intentionally commingled client escrow funds with his own funds in his Operating Account on a regular basis." Further, after transferring Mr. Huggins's settlement funds into his Operating Account, Respondent utilized this account for business and personal purposes. On June 24, 2004, just two days after transferring the settlement funds from Mr. Huggins's case, Respondent make a $328 purchase at Lett's Bridal Shop with funds taken from his Operating Account.

At the hearing court, Respondent did not produce any records that demonstrated that he safeguarded or maintained $5,000 in his Operating Account due and payable to Mr. Huggins and the medical providers for the entire time between June 22, 2004 and October 16, 2004. As a result of his failure to keep track of the balance in his Operating Account, Respondent was unaware whether the Operating Account ever lacked sufficient funds to pay Mr. Huggins and the medical providers.

In connection with his delay in distributing settlement proceeds, Respondent did not have sufficient funds in his Trust and Operating Accounts to cover the total owed to the two medical providers for the majority of the time between the

date that the settlement funds were available to Respondent and the date that Mr. Huggins was presented with his first distribution check. Respondent only had sufficient funds in his two accounts to pay both medical providers for 14 days total out of a 77 day period.

Respondent alleges that he delayed payments to the medical providers in the instant case in order to negotiate a better deal for Mr. Huggins. The hearing court did not find this explanation for delaying payments to the medical providers to be credible upon considering that "Respondent never discussed negotiating such reduced medical payments with Mr. Huggins until one month after Mr. Huggins's personal injury case had been settled and the ... settlement payment had been received." Despite the fact that the October 16, 2004, settlement sheet reflected the final "negotiated" amounts, Respondent failed to send any correspondence regarding these negotiated figures to the medical providers for another two months (mid-December 2004), and did not pay them for several weeks after sending the correspondence. Respondent failed to maintain sufficient funds to pay the providers in his Trust and Operating Accounts for the majority of the time from June 22, 2004, through December 29, 2004.

Respondent gave the following reasons to the hearing court for his delay in making payment to Mr. Huggins: "that he was delayed for personal reasons in that he traveled out of state to be married, that it took time for him to negotiate a better deal with the medical providers, and that he had to cancel their September 2004 meeting (where Respondent had planned to give Mr. Huggins a check for $1,000) as a result of a fire in Respondent's office building." The hearing court did not find Respondent's other stated reason for delaying payment to Mr. Huggins to be credible after considering that, even if Respondent had negotiated reduced payments with the medical providers during the July–October 2004 period, he still should have sent Mr. Huggins a check for the amount reflected in the original settlement sheet ($804) and then supplemented that figure upon successfully negotiating lower payment amounts.

From September 20–22, 2004, Respondent's Operating Account had less than $1,000, which casts doubt on Respondent's intent to pay Mr. Huggins the promised $1,000 at the meeting scheduled for September 20, 2004. The meeting was canceled by Respondent at the last minute due to a purported fire at his office building, the existence of which was neither proven by the Respondent nor challenged by the Petitioner. Following the canceled meeting of September 20, 2004, Respondent did not mail the $1,000 check to Mr. Huggins and did not disburse any funds to Mr. Huggins until after Mr. Huggins's AGC complaint had been filed. Respondent gave Mr. Huggins a postdated check without informing him and lacked sufficient funds to pay Mr. Huggins the $804 net amount that Mr. Huggins was due under the original June 21, 2004 settlement statement for a number of days between June 22 and October 16, 2004.

The hearing court made the following conclusions of law:

**1. Respondent violated Rule 1.15(a) of the MARYLAND LAWYERS' RULES OF PROFESSIONAL CONDUCT by transferring Mr. Huggins' funds into his Operating Account.[13]**

Rule 1.15(a) ... [hereinafter "MRPC 1.15(a)"] provides, *inter alia,* that "[a] lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property," and that "[f]unds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules." Respondent violated these provisions of MRPC 1.15(a) when he transferred the entire $7,500 from Mr. Huggins' settlement from his Trust Account into his Operating Account on June 22, 2004, including $4,982 in proceeds that properly belonged to Mr. Huggins and to the Medical Providers, thereby commingling those trust funds

---

13. The hearing court noted that all violations of the MRPC mentioned in its "Conclusions of Law" refer to those Rules that were in effect prior to July 1, 2005. MRPC 1.15(a), specifically, was not impacted by the Rules changes that became effective July 1, 2005.

with his own funds. Though Respondent's stated purpose for the transfer was so that he could disburse the proceeds to Mr. Huggins and the medical providers, he did not disburse any funds until approximately four months later (starting October 16, 2004), and it took more than two months beyond that date to complete the disbursements (the last being made on January 5, 2004).

**2. Respondent also violated MRPC 1.15(a) by failing to maintain complete records of Mr. Huggins' funds.**

MRPC 1.15(a) further provides that "[c]omplete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation." Respondent testified that he did not have any ledger cards for the funds of Mr. Huggins or those of other clients he was holding in trust but that he maintained a working knowledge of the client funds. However, Respondent could not identify any documents that he might have maintained to enable him to account for the funds that he was holding in trust. Additionally, Respondent testified to the effect that he did not know the amount of funds that he was holding for Mr. Huggins and the medical providers—or whether he was spending their funds when he drew on his Operating Account—because he had no business records that would give him that information. Respondent thus violated MRPC 1.15(a) by failing to maintain records accounting for the funds of his client, Mr. Huggins, and of the third-party medical providers that were entrusted to him.

**3. Respondent violated MRPC 1.15(b)[14] by failing to pay Mr. Huggins and his medical providers promptly.**

MRPC 1.15(b) provides, *inter alia*, that, "[e]xcept as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to

---

14. The hearing court noted that this provision of the MRPC was renumbered as Rule 1.15(d) on July 1, 2005; however, for the time period at issue in this matter, it is correctly discussed as Rule 1.15(b). The court noted that there was no change made to the substance of this provision by the July 1, 2005 Rules changes.

the client or third person any funds or other property that the client or third person is entitled to receive.... [The full text of MRPC 1.15(b) (prior to July 1, 2005) reads as follows: "Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property."] Respondent violated this rule when he failed to disburse any settlement proceeds to Mr. Huggins between June 22 and October 16, 2004. Even if the Respondent decided after June 22, 2004 to negotiate a better deal with the medical providers on half of Mr. Huggins, Respondent was still obligated to promptly disburse $804 to Mr. Huggins, as indicated on the settlement statement provided by Respondent during their June 21, 2004 meeting. Respondent could have disbursed any additional amount that later became due Mr. Huggins at that future point in time.

Respondent also violated MRPC 1.15(b) when he failed to promptly disburse settlement proceeds to the third-party medical providers. Respondent first violated this provision as to the medical providers when he failed to promptly pay them after depositing the settlement proceeds into his Trust Account on June 21, 2004. During the June 21, 2004 meeting between Respondent and Mr. Huggins, the Respondent indicated that he was going to disburse the proceeds in accordance with the settlement sheet presented at that time. Respondent did not inform Mr. Huggins that he was attempting to negotiate a better deal with the medical providers until the second half of July 2004 (a month after the funds became available); further, that effort was initiated solely by the Respondent. Assuming *arguendo* that Mr. Huggins acquiesced to that course of action, Respondent was still obligated to pay the third-party medical providers

from June 22, 2004 through the second half of July 2004, at which point the Respondent presumably began to represent Mr. Huggins in negotiating with the medical providers.

Respondent again violated MRPC 1.15(b) as to the medical providers when he failed to promptly pay them after providing Mr. Huggins the revised settlement sheet on October 16, 2004 and after disbursing funds to Mr. Huggins on that date. Respondent waited almost two months after that meeting before he ever sent a letter to the two medical providers seeking confirmation of a negotiated payment amount; however, that amount had clearly been negotiated prior to October 16, 2004, as the final payments to which the medical providers ultimately agreed were the exact figures that Respondent indicated on the October 16, 2004 settlement sheet.

Respondent's delays in paying the medical providers from June 22 through late July 2004, as well as from October 16 through December 29, 2004, were therefore not related to efforts on behalf of his client, but instead were for Respondent's own benefit. Respondent thus violated MRPC 1.15(b) by failing to promptly deliver to the third-party medical providers those funds to which they were entitled.

**4. Respondent violated MRPC 8.4(c) and (d), Maryland Rule 16–609, and MD. CODE ANN., Bus. Occ. & PROF. § 10–306 by spending money that belonged to Mr. Huggins and to the medical providers for his own purposes.**

The applicable sections of MRPC 8.4 provide that "[i]t is professional misconduct for a lawyer to (b) commit a criminal act that reflects adversely on the lawyer's honest, trustworthiness or fitness as a lawyer in other respects; (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice." Maryland Rule 16–609 states the following: "An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized

purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer." (Amended, June 5, 1996, effective Jan. 1, 1997). Finally, MD. CODE ANN., Bus. Occ. & PROF. § 10–306 provides that, "[a] lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer."

In the present matter, Respondent transferred all of the proceeds from Mr. Huggins' settlement ($7,500) from Respondent's Trust Account to his Operating Account on June 22, 2004. Of that amount, $4,982 were funds that rightfully belonged to Mr. Huggins and to the two third-party medical providers, Advanced Radiology and Horizon Medical Center. Respondent did not safeguard those funds, but rather used that money for his own business and personal needs, as evidenced by the fact that the combined balances in Respondent's Trust and Operating Accounts were less than $4,982 for the entire period from June 22, 2004 through October 16, 2004 (when Respondent first made a disbursement to Mr. Huggins), with the exceptions of six days when the combined balances exceeded $4,982. At all other times during this period, the combined balances in Respondent's Accounts were less than $4,982 usually much less—and were even negative on occasion. The only logical conclusion is that Respondent intentionally used the proceeds that rightfully belonged to Mr. Huggins and to the two third-party medical providers for his own purposes, and later paid Mr. Huggins and the medical providers with money that he had obtained elsewhere.

Respondent's conduct of intentionally spending the funds of Mr. Huggins and the medical providers, to whom Respondent owed a fiduciary duty, and without authorization, rises to the level of misappropriation. The Court of Appeals has consistently held that misappropriation of client funds violates MRPC 8.4(c). [*Attorney Griev. Comm'n v. Cherry–Mahoi*, 388 Md. 124, 159, 879 A.2d 58, 80 (2005).] Consequently, this court finds that the Respondent violated MRPC 8.4(c).

Further, the Court of Appeals has also held that conduct constituting misappropriation of client or third-party funds is "prejudicial to the administration of justice" in violation of MRPC 8.4(d). Consequently, Respondent's conduct described above is "prejudicial to the administration of justice" and thus violates MRPC 8.4(d).

Additionally, by using the trust funds of Mr. Huggins and the medical providers for his own use while acting as their fiduciary, and without receiving any authorization to do so, Respondent violated both Maryland Rule 16–609 and MD. CODE ANN., Bus. Occ. & PROF. § 10–306.

However, this court finds that Petitioner has not met its burden of proof as to the underlying criminal conduct necessary to find a violation of MRPC 8.4(b), and thus this court finds that the Petitioner has not violated MRPC 8.4(b).

**5. Respondent violated Rule 1.3 by failing to preserve the ability to pay the medical providers promptly.**

MRPC 1.3 provides that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." The Court of Appeals has further held that at attorney's failure to pay medical providers demonstrates a lack of diligence in violation of MRPC 1.3. *Attorney Grievance Comm'n v. Gallagher*, 371 Md. 673, 710 [810 A.2d 996] (2002); *Cherry[–]Mahoi*, 388 Md. at 156–57 [879 A.2d 58]. In the matter under consideration, Respondent did not disburse any funds to the two medical providers until over six months after the settlement funds became available. Even giving Respondent the benefit of the doubt for the period from late July 2004 through October 16, 2004, during which time Respondent was negotiating reduced payments on behalf of Mr. Huggins, there were still three months during which time Respondent did not disburse any funds to the medical providers. From June 22, 2004 until late July 2004 (at which point Respondent was first authorized by Mr. Huggins to negotiate reduced payments) and from October 16, 2004 until December 29, 2004, Respondent failed to pay the medical providers. Further, the combined balances of

Respondent's Trust and Operating Accounts lacked sufficient funds to pay the medical providers for the great majority of days during these periods. This situation is analogous to that of *Cherry[–]Mahoi*, (388 Md. at 156–57 [879 A.2d 58]), in which the attorney had been unable to pay the medical providers due to insufficient funds in her trust account. Just as the Court of Appeals held in *Cherry[–]Mahoi* that such actions violated MRPC 1.3, this court finds that Respondent's inability to pay Mr. Huggins' medical providers during the periods discussed above constitutes a violation of MRPC 1.3.

## STANDARD OF REVIEW

 We have original jurisdiction over attorney discipline proceedings. *Attorney Griev. Comm'n v. Christopher*, 383 Md. 624, 638, 861 A.2d 692, 700 (2004). This court is required to conduct "an independent review of the record, accepting the hearing judge's findings of fact unless clearly erroneous ... [and][w]e will not disturb the factual findings of the hearing judge if they are based on clear and convincing evidence." *Id.* (citations omitted). Our review of the hearing judge's conclusions of law is *de novo*. *Attorney Griev. Comm'n v. Kapoor*, 391 Md. 505, 529–30, 894 A.2d 502, 517 (2006) (quoting *Attorney Griev. Comm'n v. Cherry–Mahoi*, 388 Md. 124, 152–53, 879 A.2d 58, 76 (2005)).

## DISCUSSION

Bar Counsel filed no exceptions to the Circuit Court's findings of facts and conclusions of law. Respondent took exception to all findings of fact which are purportedly dependant on the bank records which Respondent contends should have been excluded from the evidentiary hearing. Respondent further takes exception to the legal conclusions that he violated MRPC 1.15(a) and (b), MRPC 1.3, MRPC 8.4(c) and (d), Rule 16–609, and Md.Code Ann., Bus. Occ. & Prof. § 10–306.

## Exclusion of Bank Records

Respondent excepts to all findings of fact purportedly based on the bank records which he asserts were erroneously admitted into evidence. The background facts concerning Respondent's argument can be gleaned from an examination of oral argument presented at the hearing by both counsel for Respondent and for Petitioner in regard to Respondent's Motion in Limine to exclude the bank records:

[COUNSEL FOR RESPONDENT]: [I]t was in relatively short order that I became involved in this case and from that time to when the deposition of Mr. Roberts occurred.

During the deposition, opposing counsel perceived Mr. Roberts' testimony as not as forthcoming as he had anticipated. He had also asked at the beginning of the deposition if we would stipulate to the admissibility of certain bank records.

What I explained to opposing counsel at the outset of the deposition was that I had just recently gotten involved in the case and I wasn't prepared at that time to enter into any stipulations.... [O]pposing counsel stated to me ... that he was inclined to broaden the investigation of Mr. Roberts to other unrelated matters for which he already had apparently the bank records in question or evidence in question regarding these other unrelated matters.

But the reasoning given by opposing counsel was that now we were mounting an aggressive defense, and because we would not stipulate to the admissibility of bank records, he was inclined to broaden the investigation into unrelated matters.

I immediately voiced my objection to that statement and to that objective and asked to meet with Bar Counsel. A meeting with Bar Counsel ensued where I stated my position. I thought that that was an abuse of process. I thought it was inappropriate for someone from Bar Counsel's office to state that they would be investigating someone on unrelated matters as a result of their essentially contesting certain matters in an unrelated proceeding.

Bar Counsel disagreed with me after a conversation, and that's why I filed a motion. I think it is inappropriate. It puts my client in a position where he can't effectively defend himself.

\* \* \* \*

[BAR COUNSEL]: [Counsel for Respondent] has not accurately characterized my motivation in speaking to him. It was my belief that [Respondent] was not contesting that he had not only deposited Mr. Huggins'[s] funds in his bank account but had spent them on his own purposes prior to disbursing any funds, and, in fact, depleted the funds entirely and used other funds to pay Mr. Huggins. And the bank records would have indicated that and do indicate that.

His denial at deposition of what seemed to me a real knowledge of his bank records or his failure to acknowledge his bank records made ... me believe ... it might be more difficult to prove what I thought I could prove to begin with. Because I ... did not have certified copies of the bank records. I hadn't subpoenaed the bank records.

Bar Counsel stated that his motive in mentioning the broadening of the investigation was to ensure that, should he no longer be able to bring the proceedings in the instant case, he would then pursue the other violations that he believed had occurred. Bar Counsel also stated that he did not seek a stipulation as to the bank records during his conversation with Respondent's counsel. With regard to the exact words he used with Respondent's counsel, Bar Counsel stated:

I believe I said ... that I was inclined to look into the deposits that [Respondent] made in November 2004 into his operating account of funds which were used to pay the medical providers and the one check which was issued to Mr. Huggins because I believed those deposits represented other personal injury settlements.

And that's what I told him. I didn't say it was done because he wouldn't stipulate. That's a matter within his discretion. It's within our discretion to open a file or not

open a file. And I was simply telling him that the testimony of his client ... made the exercise of discretion to open a file the appropriate thing to do in my view.

At the time of the oral argument, Bar Counsel had subpoenaed the bank records, but explained that the records still had not been produced due to the bank's difficulty in locating them. Bar Counsel argued that he did not think that bringing the additional unrelated charges was necessary because disbarment is warranted in cases involving the misappropriation of client funds, and he believed that Respondent would likely be disbarred as a result of the charges in the instant case, thus making any additional charges unnecessary.

 Respondent claims that his ability to challenge the bank records at issue was fundamental to his due process right to defend himself from the charges brought against him in the instant case. Respondent argues that the alleged threat of the institution of additional proceedings to gain advantage in the instant case constituted an abuse of process. Abuse of process is a tort and occurs when a party has "wilfully misused criminal or civil process after it has issued in order to obtain a result not contemplated by law." *Krashes v. White*, 275 Md. 549, 555, 341 A.2d 798, 802 (1975) (citations omitted).

> The essential elements of the abuse of process, as the tort has developed, have been stated to be: first, an ulterior purpose, and second, a wilful act in the use of the process not proper in the regular conduct of the proceeding. Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.

*Palmer Ford, Inc. v. Wood*, 298 Md. 484, 511, 471 A.2d 297, 311 (1984) (citation omitted). "A bad motive alone is not sufficient to establish an abuse of process." *One Thousand Fleet Ltd. Partnership v. Guerriero*, 346 Md. 29, 38, 694 A.2d

952, 956 (1997). In order to establish an abuse of process, there must be a definite act or threat that is not authorized by the process "or aimed at an objective not legitimate in the use of the process[.]" *Id.* (quoting W. KEETON, PROSSER & KEETON ON THE LAW OF TORTS § 121, at 898 (5th ed.1984)). In *Capitol Elec. Co. v. Cristaldi,* 157 F.Supp. 646 (D.Md.1958), the United States District Court for the District of Maryland stated that as abuse of process requires "a perversion of court process to accomplish some end which the process was not designed to accomplish; it does not arise from a regular use of process, even with ulterior motives." *Id.* at 648 (citation omitted).

■ We overrule Respondent's exceptions to the hearing judge's findings of fact and reject his claim of abuse of process. One of the essential elements of the tort of abuse of process is a definite act or threat that is not authorized by the process, or aimed at an objective that is not legitimate in the use of the process. In the instant case, Bar Counsel indicated an intent to bring charges against Respondent that, although unrelated to the current charges against Respondent, were supported by credible evidence in the opinion of Bar Counsel. Subject to any required supervision and approval of the Commission, Bar Counsel has the powers and duties to, *inter alia,* investigate professional misconduct; file statements of charges and prosecute all disciplinary and remedial proceedings; and perform other duties prescribed by the Commission and the Rules in Title 16, Chapter 600 regarding attorney trust accounts. Md. Rule 16–712(b)(1), (4), (13).

Bar Counsel indicated to the hearing judge that he had reason to believe that Respondent had misappropriated client funds on other specific occasions, but anticipated Respondent's disbarment as a result of the charges brought in the instant case, and, thus, chose not to pursue those other charges. When faced with the prospect of having insufficient evidence to proceed in the instant case as a result of the lack of bank records, Bar Counsel indicated to Respondent's counsel that he would be "inclined" to broaden his investigation. Proceeding with an investigation into other matters by authorized and legitimate means does not constitute an abuse of process.

Regardless of any perceived motive, Bar Counsel's threat constituted nothing more than carrying out the attorney grievance process in an authorized manner.

## RESPONDENT'S EXCEPTIONS TO CONCLUSIONS OF LAW

### MRPC 1.15(a)

In rejecting the finding that he violated MRPC 1.15(a), Respondent first argues that the conclusion that he commingled client funds with his own relies on the bank records which, in his opinion, were inadmissible. Having determined that the bank records were properly admitted and for the foregoing reasons, we accept the hearing judge's conclusion of law as to the commingling of funds in violation of Rule 1.15(a).

■ Respondent contests the finding that he failed to maintain complete records of client funds, citing as evidence to the contrary that he had a written fee agreement describing the division of settlement funds, presented the settlement check constituting these funds, produced a settlement statement, maintained a release documenting gross settlement proceeds obtained by the client, provided a second statement of settlement to the client, generated checks distributing settlement funds to the client, and produced confirmatory letters sent to medical providers documenting their share of settlement funds. Respondent asserts that MRPC 1.15(a) does not mandate a specific record keeping system, but only regulates the maintenance of existing records pertaining to client funds.

We overrule Respondent's above exception. Respondent testified that he maintained a working knowledge of the client funds that was sufficient to meet the accounting requirements of Rule 1.15(a). Signing a fee agreement and tracking the disbursements of settlement funds might provide a definitive beginning and end to Respondent's handling of funds in a client's case, but it does not provide an accurate accounting of client funds at any point in between. As found by clear and convincing evidence and by Respondent's own testimony, Respondent could not identify any documents that he might have

maintained to enable him to account for the funds that he was holding in trust. Further, Respondent testified that he did not know the amount of funds that he was holding for Mr. Huggins and the medical providers because he had no business records that would give him that information.

Respondent thus violated MRPC 1.15(a) by failing to maintain records accounting for the funds of his client, Mr. Huggins, and of the third-party medical providers that were entrusted to him. We also overrule Respondent's exception as to the conclusion that he failed to maintain complete records of client funds. Contrary to Respondent's assertion, MRPC 1.15(a) does not simply regulate the maintenance of existing records of client funds, but requires that "[c]omplete records of such account funds and of other property ... be kept by the lawyer and ... be preserved for a period of five years after termination of the representation."

### MRPC 1.15(b) and 1.3

Respondent notes that his failure to promptly distribute settlement funds is fundamental to this determination, and defends as "perfectly acceptable" his decision to await the final settlement of all related claims before disbursing client funds. Respondent also asserts that his client did not receive the settlement proceeds only because the client failed to meet Respondent's colleague as agreed, that his failure to promptly pay medical providers was due to his ongoing negotiations with them on behalf of his client, and that the conclusion that Respondent delayed payment "for his own benefit" is dependant on the bank records and nevertheless unsupported by the findings of fact.

We overrule Respondent's above exceptions. Respondent's failure to promptly deliver settlement funds to his client and to medical providers was not "perfectly acceptable" under MRPC 1.15(b), which provides that, "[e]xcept as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or

third person is entitled to receive." "We have previously held that an attorney who does not pay a client's debt from settlement funds violates Rule 1.15(b)[.]" *Cherry–Mahoi, supra*, 388 Md. at 156–57, 879 A.2d at 78 (citations omitted). Further, "an attorney's failure to pay medical providers demonstrates a lack of diligence in violation of Rule 1.3." *Id.* at 157, 879 A.2d at 78 (citing *Attorney Griev. Comm'n v. Gallagher*, 371 Md. 673, 710, 810 A.2d 996, 1018 (2002)).

In the instant case, the fact that the client allegedly missed a meeting with Respondent's colleague in which the funds were to be dispersed is immaterial since it was Respondent's responsibility to turn over the funds to his client. As the hearing judge found, any negotiations with medical providers were initiated solely by Respondent, and Respondent did not inform his client of any such negotiations until a month after the funds became available. The hearing judge's conclusion that Respondent delayed payment for his own benefit finds support in the bank records, is not clearly erroneous.

MRPC 8.4(c) and (d); Rule 16–609;

Section 10–306 of the Business Occupations
and Professions Article

Respondent asserts that the hearing judge's conclusion that Bar Counsel did not demonstrate dishonest criminal behavior by Respondent under MRPC 8.4(b) precludes the finding of any violation under MRPC 8.4. Respondent further argues that the lack of a finding of willfulness demonstrates that the hearing judge was not convinced that Respondent acted in a fraudulent or deceitful manner, nor with the intent to deprive his client and the medical providers of settlement proceeds.

 We overrule the above exception. "This Court consistently has found an attorney's misappropriation of client funds to violate MRPC 8.4(c)." *Cherry–Mahoi*, 388 Md. at 159, 879 A.2d at 80 (2005) (citations omitted). Similar to the instant case, the attorney in *Cherry–Mahoi* also used the proceeds from the settlement of a personal injury suit, which were held by the attorney in trust and were to be transferred either to

her client or to the client's medical providers, for personal transactions. *Id.* at 136, 879 A.2d at 65. Like the hearing judge in *Cherry–Mahoi,* the hearing judge in the instant case concluded that Respondent intentionally used proceeds belonging to his client and to his client's medical providers for his own purposes. We accept this conclusion, as it is not clearly erroneous based on the record before us. "This Court has also found conduct constituting the misappropriation of client or third party funds to be 'prejudicial to the administration of justice' in violation of [MRPC] 8.4(d)." *Id.* at 159, 879 A.2d at 80 and cases cited therein. In *Cherry–Mahoi,* this Court also found a violation of Maryland Rule 16–609 and of Md.Code (1989, 2004 Repl.Vol. & 2005 Supp.), § 10–306 of the Business Occupations and Professions Article when the attorney misappropriated settlement proceeds, belonging to her client or to third-party medical providers, for her own purposes. *Id.* at 157–58, 879 A.2d at 78–79.

## SANCTIONS

When imposing disciplinary sanctions for violations of the Maryland Rules of Professional Conduct, it is this Court's purpose to protect the public, promote general and specific deterrence, and maintain the integrity of the legal profession. *Cherry–Mahoi,* 388 Md. at 160, 879 A.2d at 80 (citations omitted). The appropriate sanction depends on the facts and circumstances of each case, including any mitigating factors. *Attorney Griev. Comm'n v. Zuckerman,* 386 Md. 341, 375, 872 A.2d 693, 713 (2005) (citations omitted).

Petitioner recommends a sanction of disbarment. Respondent suggests several possibilities for sanctions, including a reprimand; an indefinite suspension; and a conditional diversion program, such as law office management courses or supervision by an attorney if Respondent returns to private practice and to handling trust funds.

The hearing court noted several mitigating circumstances. First, Respondent has fully paid all of the money owed to his client and to the medical providers, and he voluntarily reduced

his fee from $2,500 to $2,211. Respondent was also making arrangements to be married in Michigan around the time that he settled the case in question. These arrangements and the blending of a new wife and stepdaughter into a family with his daughter resulted in significantly increased levels of stress and personal expenses for the Respondent during the second half of 2004, and likely impeded the Respondent's ability to focus on his legal practice and professional responsibilities. In August 2005, Respondent left private practice and went to work as a Public Defender in Prince George's County. Respondent has thus removed himself entirely from the business management side of legal practice and has, for now, eliminated his need to account for escrow funds. The hearing court noted that, while this cannot make up for his prior conduct, Respondent's actions at least demonstrate some recognition of his woefully inadequate business and accounting practices, and show some effort to prevent a future recurrence of the issues currently before this court. While Respondent need only prove mitigating circumstances by a preponderance of the evidence, the hearing court was satisfied that the mitigating circumstances had been demonstrated by clear and convincing evidence.

 "Misappropriation of funds by an attorney is an act infected with deceit and dishonesty and ordinarily will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction." *Attorney Griev. Comm'n v. Vanderlinde,* 364 Md. 376, 406, 773 A.2d 463, 480 (2001) (citations omitted). *See also Cherry–Mahoi,* 388 Md. at 161, 879 A.2d at 81 (citing *James, supra,* 385 Md. at 666, 870 A.2d at 245). The sanction of disbarment is so justified because attorneys are charged with remembering that " 'the entrustment to them of the money and property of others involves a responsibility of the highest order. They must carefully administer and account for those funds. Appropriating any part of those funds to their own use and benefit without clear authority to do so cannot be tolerated.' " *Id.* at 161, 879 A.2d at 81 (quoting *Attorney Griev. Comm'n v. Owrutsky,* 322 Md. 334, 345, 587 A.2d 511, 516 (1991)). In the

instant case, the above mitigating factors are not sufficiently compelling to excuse Respondent's intentional misappropriation of funds, and therefore Respondent's misconduct warrants disbarment.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT; INCLUDING COSTS[15] OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST QUINTON D. ROBERTS.*

---

**15.** Respondent asserts that he should not be responsible for costs under Rule 16–761 because, *inter alia*, only four of the fourteen charges brought by Bar Counsel were sustained, and therefore Respondent should be considered the prevailing party for the purposes of cost allocation. When a sanction of disbarment is imposed, the attorney is not the "prevailing party" by any stretch of the imagination. We deny Respondent's request. Md. Rule 16–761(a); Md. Rule 16–760(h)(7).