6 A.3d 287

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Ozoemena Maryrose NWADIKE.

Misc. Docket AG No. 11, Sept. Term, 2009.

Court of Appeals of Maryland.

Aug. 25, 2010.

Reconsideration Denied Nov. 18, 2010.

182

Gail D. Kessler, Asst. Bar Counsel (Glenn M. Grossman, Bar Counsel, Attorney Grievance Commission of Maryland), for Petitioner.

John O. Iweanoge, Jr. of The Iweanoges Firm, P.C. of Washington, DC, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

Respondent, Ozoemena Maryrose Nwadike, was admitted to the Maryland Bar on 17 June 1992. On 1 May 2009, the Attorney Grievance Commission, acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action in which it asserted that Respondent violated several provisions of the Maryland Rules of Professional Conduct ("MRPC") and a

number of other rules and a statutory provision governing the practice of law through her prolonged pattern of mishandling and abuse of funds in her attorney trust account. We referred the matter to the Honorable Joseph A. Dugan, Jr., of the Circuit Court for Montgomery County, to conduct an evidentiary hearing and render findings of fact and recommended conclusions of law with regard to the alleged violations.

Following a two-day hearing at which the parties presented conflicting and confusing evidence, Judge Dugan concluded, by clear and convincing evidence, that Respondent violated MRPC 1.15(a) (Safekeeping Property) and 8.4(a), (c), and (d) (Misconduct); Maryland Rules 16–604 (Required Deposits), 16–607 (Commingling of Funds), and 16–609 (Prohibited Transactions); and Maryland Code (1989, 2004 Repl. Vol.), Business Occupations and Professions Article, § 10–306 (hereinafter "Business Occupations and Professions Article § 10–306") (Misuse of Trust Money).

Petitioner took no exceptions and recommended disbarment. Respondent noted several exceptions to Judge Dugan's findings and conclusions, in which she asserted that she violated none of the above-noted provisions as alleged by Bar Counsel. As a fallback position of sorts, were this Court to conclude that Respondent violated any of the provisions with which she was charged, the worst case scenario conceived of by Nwadike is that she may have violated MRPC 1.15(a) and Md. Rule 16–607 because of "commingling resulting from not promptly withdrawing her earned attorneys' fees from the trust account." If that were the Court's resolve, she urges that we should "impose a sanction that is not in excess of [a] reprimand or 30 days suspension." For reasons we shall explain, we overrule Respondent's exceptions and find that her considerable misconduct warrants disbarment.

## I. FINDINGS OF FACT

The Attorney Grievance Commission became alert to Respondent's potential improper conduct following entry by the Circuit Court for Montgomery County, on 2 August 2006, of a

civil judgment for $14,500 in favor of Mr. Bolly Ba against Respondent on Ba's claim of misappropriation of funds. The Commission's subsequent investigation of Respondent revealed a persistent pattern of misconduct with regard to funds in her attorney trust account as to Mr. Ba and others.

A. *The Ba Law Suit and the Njosa*
*Foreclosure Avoidance Scheme*

Ba's civil claim against Respondent arose out of a contract between Ba and Ivo Fotoh Njosa (a contract procured by Respondent) in which Ba sought to purchase certain real property from Njosa. The record shows that, in 2003, Respondent was engaged in representing Njosa in his then-ongoing divorce action. At some point during that representation, Njosa's sister, Ba's co-worker at Long & Foster Realtors, informed Ba that Njosa's home was in foreclosure; in response, Ba expressed interest in purchasing the property.

On 17 July 2003, six days prior to the scheduled date of the foreclosure sale, Respondent sent a letter to Worthington H. Talcott, the attorney representing the foreclosing lender's interest, requesting that the foreclosure sale be postponed for fifteen days so that Ba could have an opportunity to purchase the property from Njosa and his soon-to-be ex-wife. Talcott denied the request, advising instead that the lender might reconsider pursuit of its foreclosure action upon receipt and review of an executed contract of sale. Judge Dugan found that, at some point prior to the scheduled foreclosure sale date of July 23,[1] Ba and Njosa met with Respondent, who agreed to find a lender to facilitate the removal of Njosa's property from foreclosure. Apparently, the Njosas were $14,500 in default on the secured loan. Ba agreed to purchase the property and

---

1. Respondent claimed at the trial on Ba's civil action that her first contact with Ba occurred on 18 July 2003, when Ba, Njosa, and Njosa's sister met with Respondent in her office to discuss the sale of the Njosa property. Ba testified to the contrary, insisting that this meeting never occurred. Judge Dugan found, however, that some meeting between Ba, Respondent, and Njosa had to have occurred (although not necessarily on July 18) before Respondent proceeded with her scheme on July 22.

repay the loan that Respondent was to secure; that agreement, however, was never reduced to writing.

To facilitate Ba's purchase and remove Njosa's property from default, Respondent "borrowed" $14,500 from the funds in her attorney trust account, funds which belonged to Eke Onuma, an individual whom Respondent claimed to represent.[2] Respondent withdrew $14,500 from the trust account on July 22 and caused to be drawn a cashier's check in like amount, payable to Talcott's law firm. Respondent presented the check to Talcott's law office in person that day.

On August 14, Ba gave Respondent a cashier's check for $14,500 and executed with Respondent, who purported to be acting on behalf of Njosa, a document entitled "Offer to Sell Real Estate." Although Respondent did not have power of attorney authorization from Njosa, she executed nevertheless the contract as a "holder of owner's/seller's Power of Attorney." The contract provided that Ba's $14,500 check was a "deposit" on the purchase price of the property. Judge Dugan found, however, that the contract did not depict the true agreement of the parties' prior dealings, because, in fact, the $14,500 represented the repayment of the "loan" made allegedly by Onuma. Respondent could not explain to Judge Dugan or Bar Counsel why she executed a contract that did not reflect the agreement of the parties.

On August 15, Talcott mailed Respondent a refund check in the amount of $468.06 for overpayment of the amount in default required to remove Njosa's property from foreclosure. Respondent did not deposit that refund check into her attorney trust account. Talcott testified that the refund check never cleared his account, and stated that Respondent told him not to reissue the refund check to her.

Ultimately, a problem with the appraisal of Njosa's property prevented Ba from settling on the contract to purchase the

---

**2.** Respondent asserted that Onuma consented to the "loan"; however, Onuma did not testify to corroborate Respondent's claim at the evidentiary hearing in the present disciplinary matter or at the civil trial on Ba's claim.

property. Ba requested that Respondent return his "deposit" of $14,500. Respondent refused, replying that Ba had agreed that the money would go to the bank to remove Njosa's property from foreclosure. Instead, in a letter dated 24 September 2003, Respondent referred Ba to the Judgment of Absolute Divorce in Njosa's divorce case, wherein Ba was granted the possibility of reimbursement of his $14,500 from the proceeds of the sale of the Njosa property (assuming adequate net proceeds resulted), if he would submit proof, within 14 days after the divorce judgment, that he had removed the property from foreclosure. The letter made no mention that Ba's funds were used to repay a "loan" that Respondent "borrowed" from an alleged client to cure the foreclosure.

As a consequence of these dealings, Ba filed a civil claim against Respondent in the Circuit Court for misappropriation of funds, which resulted in a judgment against Respondent in the amount of $14,500.[3] Although the judgment was affirmed by the Court of Special Appeals in 2008, it remains unsatisfied.

B. *Respondent's Additional Misuse of the Funds in Her Attorney Trust Account*

Following entry of the judgment against Respondent in Ba's law suit, Bar Counsel commenced a general investigation into Respondent's management of the funds in her attorney trust account. As part of this investigation, Bar Counsel served Respondent with a subpoena on 25 January 2008 requesting that she provide certain financial data and records regarding her trust account and other professional accounts relevant to the period of 2 January 2002 through 30 June 2006. In response, Respondent produced only copies of deposit slips and customer receipts from 21 March 2003 through 7 June 2006, monthly bank statements from 1 August 2003 through 31 May 2006, and disbursed checks from 25 April 2003 through 22 May 2006 related to the trust account. Respondent never produced any requested billing statements, ledger cards, or

_____

3. In addition, Ba secured a judgment of $14,500 against Njosa in the same action.

accounting of funds that she received, maintained, and disbursed from her trust account during this period.[4]

Although Respondent claimed that she knew whose money was in her attorney trust account, she provided Bar Counsel with no accounting records upon which its investigation could proceed. Bar Counsel was forced to perform its own analysis of Respondent's account, using such records as could be found. This analysis revealed numerous other aspects of Respondent's financial malfeasance and nonfeasance regarding other clients and persons.

In what might seem to be the most egregious of the instances of mismanagement of the funds in the trust account, Respondent deposited monies into the account ostensibly earmarked for the election campaign of Christopher Ngige, Respondent's brother and a gubernatorial candidate in Nigeria. According to the testimony of Anthony Isama, one of Respondent's witnesses and a friend of Ngige, Eke Onuma (who, as noted *supra*, Respondent claimed was the client from whom she had "borrowed" funds in the Njosa foreclosure scheme) is in fact a Nigerian businessman who acted as an intermediary between Respondent and the Ngige election campaign. Isama stated that Onuma agreed to pay the Ngige campaign an amount of naira [5] corresponding to funds collected and held for the campaign in Respondent's attorney trust account.

Like most of Respondent's other explanations regarding the use of the funds in her trust account, her explanation of the

---

**4.** According to Judge Dugan's findings of fact, Respondent apparently was unable to provide documentation to demonstrate that she possessed at least $14,500 of Onuma's funds in the trust account when she withdrew, allegedly with Onuma's consent, the amount necessary to cure the default on Njosa's property. Respondent testified that she deposited previously $5,000 for Onuma into her trust account, represented by a check from "Homeland Charities" with the notation "symposium 3 months," which allegedly brought Onuma's balance to almost $15,000; Judge Dugan, however, did not find this testimony credible, noting specifically that Respondent relied upon uncorroborated hearsay to explain the source of the funds used to remove Njosa's property from foreclosure and her authority to expend those funds.

**5.** "Naira" is the currency of Nigeria.

funding of the Ngige campaign through her escrow account was supported by very little documentation. Respondent claimed to have received several deposits, totaling $110,493, in her attorney trust account slated to be transferred to the Ngige campaign, but she failed to provide an accounting reflecting these deposits. In addition, there was no documentation offered to corroborate the fact that Onuma's naira payments equaling the funds collected and held in Respondent's account for Ngige in fact were paid to the campaign.[6] Respondent testified that Onuma instructed her to disburse the ostensible campaign funds in her account for the benefit of his children, who attend school in the United States. Again, no records were produced by Respondent showing the amount of these funds held in her attorney trust account or how she disbursed those funds. Respondent and her witness, Isama, even disagreed as to who managed the campaign funds; each claimed that he or she alone was responsible for collecting the funds and communicating the totals to Onuma and the Ngige campaign.

Respondent's explanations of amounts credited to her trust account, ostensibly in connection with the Ngige campaign, were similarly unsupported. Respondent claimed that $349,975 wired into her attorney trust account on 19 August 2005 "came from [unspecified] personal injury cases and from attorneys' fees and reimbursed expenses in the Dr. Ngige election tribunal case[s] in Nigeria." Respondent, however, did not have any corroborative testimonial or documentary evidence to support these oral assertions. The record shows that, on 29 August 2005, she deposited a $120,000 personal check for which Judge Dugan found she offered again no logical or coherent accounting.[7] Respondent also transferred

---

6. For a Maryland attorney to utilize his or her trust account as a holding place for a pass-through of election contributions (foreign or domestic) is, in and of itself, another issue.

7. Respondent explained, rivaling a sphinx, that she "purchased certified fund from the bank account from her earned fees [and that] her check

$50,000 into her attorney trust account in September 2005, funds which she claimed belonged to Ngige.

In addition, Respondent's refusal even to identify forthrightly Christopher Ngige as her brother was evasive, at best. Respondent stated disingenuously that Ngige merely was "somebody's name." Even though Ngige was not a client of Respondent's, she asserted an attorney-client privilege and refused to explain her relationship to him. When Isama testified that Ngige is Respondent's brother, Judge Dugan asked Respondent why she had engaged in such "subterfuge." Respondent stood mute.

The Ngige campaign funds actually were not the crowning underachievement of Respondent's misuse of the funds in her trust account. Judge Dugan found further that Respondent repeatedly advanced funds for clients prior to depositing funds into her attorney trust account to cover these disbursements. From 2002 to 2006, Respondent disbursed from the account a total of $134,312.85 prior to making deposits necessary to fund those disbursements. When asked by Bar Counsel to explain several specific instances of this practice, Respondent replied to each inquiry that each premature disbursement was due to an "administrative glitch." Settlement sheets for a number of clients showed also that actual disbursements exceeded the total amount of payment received on behalf of those clients. Still other settlement sheets did not depict accurately the disbursements made from the account. For example, client Georgina Kun–Shermand's settlement sheet states that Kun–Shermand's net settlement was $729 when the actual disbursement was $1,273, and that $1,172 was disbursed to Greater Washington Orthopaedic when the actual disbursement was $2,077.

From 1 January 2002 through 24 April 2006, Respondent also maintained personal funds in her attorney trust account. During this period, she issued checks from the account for

---

was deposited and issued to VCR for the purchase of the 'certified fund.' "

personal expenses ranging in amounts from $91.25 to $24,397, to (among other recipients) American Express, Bank of America, the Knights of Columbus, "Adeline/MaryKay," and her daughter Linda Nwadike, and had an automatic $1,559.84 monthly mortgage payment debited from her account.[8] Isama testified that three suspect debits on Respondent's trust account paid to American Express, totaling $7,820, and one check issued from the account to "MBNA," for $35,600, were payments for credit card purchases Respondent made for Ngige's wife. A further $50,000 cash withdrawal Respondent made from her account on 4 December 2002 was never explained.

## II. CONCLUSIONS OF LAW

After considering the evidence presented by the parties at the hearing, Judge Dugan determined, on 21 January 2010, that Bar Counsel proved, by clear and convincing evidence, that Respondent's actions outlined above violated MRPC 1.15(a) and 8.4(a), (c), and (d); Maryland Rules 16–604, 16–607, and 16–609; and Business Occupations and Professions Article § 10–306. Respondent filed exceptions with this Court challenging each of these conclusions of law and several of the hearing judge's findings of fact.

## III. STANDARD OF REVIEW

"This Court has original and complete jurisdiction over attorney discipline proceedings in Maryland." *Attorney Griev. Comm'n v. Thomas*, 409 Md. 121, 147, 973 A.2d 185, 200 (2009) (internal quotations and citations omitted). Our review of the record in such cases is independent, but we will not disturb any of a hearing judge's findings of fact absent a

---

**8.** The notations with which Respondent inscribed her checks illustrate the personal nature of these payments. The check to "Adeline/Mary-Kay" is for "products;" one of multiple checks made out to Respondent's daughter is for "Mercedes payments." The $24,397 check made out to the Knights of Columbus, meanwhile, bears the mysterious notation "payoff."

showing that these findings are clearly erroneous. *Attorney Griev. Comm'n v. Ugwuonye*, 405 Md. 351, 368, 952 A.2d 226, 235–36 (2008). On the other hand, we review the hearing judge's conclusions of law under a non-deferential standard. *Id.* at 368, 952 A.2d at 236.

## IV. ANALYSIS

We find no basis to disturb Judge Dugan's findings of fact in the present case. We overrule Respondent's exceptions and also find that each of the hearing judge's conclusions of law was proper, considering the credited evidence (and reasonable inferences) before him in this case. Accordingly, we hold that Respondent violated MRPC 8.4(a), (c), and (d); MRPC 1.15(a); Maryland Rules 16–604, 16–607, and 16–609; and Business Occupations and Professions Article § 10–306 in staging the Njosa foreclosure avoidance scheme and in mishandling grossly and intentionally the funds in her attorney trust account.

### A. *MRPC 8.4 and Md. Rule 16–604*

MRPC 8.4, entitled "Misconduct," provides, in pertinent part:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

* * *

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or]

(d) engage in conduct that is prejudicial to the administration of justice; . . .

MRPC 8.4.

█ Violations of MRPC 8.4(c)[9] may occur either intentionally or negligently. *See Attorney Griev. Comm'n v.*

---

9. For reasons explained *infra,* we conclude that Respondent violated MRPC 8.4(a) as a result of her violations of the other provisions of the Maryland Rules of Professional Conduct.

*McLaughlin,* 409 Md. 304, 320–29, 974 A.2d 315, 324–29 (2009) (distinguishing between intentional and negligent misrepresentations made to Bar Counsel during a disciplinary action). The line between intentional and negligent violations is exemplified in two recent cases. In *Attorney Grievance Commission v. Ellison,* 384 Md. 688, 867 A.2d 259 (2005), we held that an attorney violated MRPC 8.4(c) when he rescinded intentionally an agreement in which he had promised to pay a physical therapist who treated his client in a personal injury case. *Id.* at 711, 867 A.2d at 272. Ellison sent a letter to the therapist that stated falsely that he no longer represented the client who had been treated. *Id.* We found that Ellison intended to avoid paying the physical therapist by misrepresenting in his letter his ongoing representation of the client. *Id.* We noted additionally that Ellison concealed purposefully during Bar Counsel's investigation his continuing representation of the client. *Id.* at 715, 867 A.2d at 274–75. On this basis, we held that Ellison "acted intentionally, the 'most culpable state,' because he acted with a 'conscious objective or purpose to accomplish a particular result.' " *Id.* (quoting *Attorney Griev. Comm'n v. Glenn,* 341 Md. 448, 485, 671 A.2d 463, 481 (1996)).

By contrast, negligent violations of MRPC 8.4(c) are not committed with a "conscious objective," but rather in an inadvertent manner. For example, we found in *Attorney Grievance Commission v. Calhoun,* 391 Md. 532, 894 A.2d 518 (2006), that an attorney's violation of MRPC 8.4(c) arose from failing to communicate properly to her client the accumulation of legal fees and costs, as required by the representation agreement. *Id.* at 571, 894 A.2d at 541. We held that Calhoun's violation of MRPC 8.4(c) was negligent because, although she had not acted dishonestly or fraudulently, she "misle[d] by silence and lack of communication." *Id.* at 548, 894 A.2d at 527.

Here, the facts indicate that Respondent violated intentionally MRPC 8.4(c) because she acted with a "conscious objective or purpose to accomplish a particular result." *Elli-*

*son*, 384 Md. at 715, 867 A.2d at 275. Respondent's violations of MRPC 8.4(c) arose when she misrepresented purposefully to Ba that she had power of attorney to execute the property sale contract on behalf of her client, Njosa. The following transcript extract from the 19 January evidentiary hearing in this case is but one clear example of this:

[BAR COUNSEL]: If you look at the second page of the document [the contract], did you sign on behalf of . . . Ivo Njosa?

[RESPONDENT]: Yes, I did.

[BAR COUNSEL]: Okay. And you signed as a power of attorney, is that correct?

[RESPONDENT]: Yes, that's what it says here [in the contract].

[BAR COUNSEL]: Okay, and at the time you executed that document . . . you did not have an executed power of attorney on behalf of Mr. Njosa, isn't that also true?

[RESPONDENT]: It is true, I did not.

Moreover, Respondent acted with the intention to conceal from Bar Counsel the identity of Christopher Ngige, her brother, by responding to Bar Counsel's inquiry regarding Ngige's identity with the vague and evasive answer that it was merely "somebody's name," as opposed to a truthful disclosure of the familial relationship.

 Similar to the facts in *Ellison,* Respondent misrepresented intentionally a fact in the Njosa/Ba contractual agreement and attempted to conceal facts from Bar Counsel's investigation. There is no distinction between slight or egregious dishonesty for purposes of MRPC 8.4(c); " '[h]onesty and dishonesty are, or are not, present in an attorney's character.' " *Ellison,* 384 Md. at 716, 867 A.2d at 275 (quoting *Attorney Griev. Comm'n v. Vanderlinde,* 364 Md. 376, 418, 773 A.2d 463, 488 (2001)). Judge Dugan found "the Respondent to be dishonest." Respondent's actions were not inadvertent; rather, Respondent decided consciously to act dishonestly with regard to the Ba/Njosa contract and her interactions with Bar Counsel. As such, Respondent violated intentionally MRPC 8.4(c).

Respondent's violation of MRPC 8.4(d) occurred when she signed the 14 August 2003 property sale agreement that did not depict the true agreement between Ba, Njosa, and Respondent. We have stated that MRPC 8.4(d) deals with the "complete trust and confidence" vested in an attorney's "public calling." *Vanderlinde*, 364 Md. at 390, 773 A.2d at 471. It is the duty of the courts and of attorneys to "uphold the highest standards of professional conduct and to protect the public from imposition by the unfit or unscrupulous practitioner." *Id.* Here, the Ba/Njosa contract stated that the $14,500 amount represented Ba's deposit. Respondent testified, however, that the $14,500 was, in fact, Ba's repayment to Respondent for the amount she paid from Onuma's escrow monies to avoid foreclosure of the property and provide Ba the opportunity to purchase the property.

Respondent's actions in this regard were contrary to the "administration of justice" because they represented a failure to uphold her obligations and fiduciary duty to Ba and Njosa. When Respondent received Ba's $14,500 check, Respondent had a duty to protect those funds as a deposit, in the event that someone else might purchase the property. She did not fulfill this obligation. Although causing to be placed in the Njosas' Judgment of Absolute Divorce Decree a provision whereby Ba might be reimbursed the $14,500 "deposit" could be interpreted as an effort by Respondent to protect Ba's interest, this effort was insufficient to safeguard the money that was entrusted to Respondent's care. Respondent's treatment of the overpayment refund check corroborates further Respondent's failure to fulfill her duty to Ba and establishes even more clearly her violation of MRPC 8.4(d).[10]

In addition, Respondent owed a duty to Njosa to draft a document reflecting accurately his liability to Ba if Njosa

---

**10.** Respondent's failure to return the refunded amount to Ba reflects clearly a violation of Rule 16–604, entitled "Trust account—Required deposits," which provides:

Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this

could not return Ba's deposit because he did not receive enough funds from the property sale. Respondent failed to do so. Her actions fall far short of adhering to her "public calling" of "complete trust and confidence." *Vanderlinde,* 364 Md. at 390, 773 A.2d at 471. Ba was foreclosed from recovering directly his $14,500 and was forced to sue Respondent and Njosa, leading to the civil judgment entered against both. We agree with the hearing judge's assessment and find that Respondent's misconduct in this regard constitutes a violation of MRPC 8.4(d).

■ Respondent's naked claim that she had Onuma's authority to use his funds to remove Njosa's property from foreclosure is unsubstantiated. Such an alleged agreement was never reduced to writing. Onuma did not testify at trial and therefore there was no corroboration of Nwadike's claim that she had such authority. Given Respondent's irresponsible and haphazard accounting records and her pattern of dishonesty, it is easy to appreciate and endorse Judge Dugan's assessment that there was no such authorization. We have observed that, in cases in which it is shown that the attorney engaged in systemic and far-ranging financial malfeasance/non-feasance with other persons' money in his or her trust account and proceeded to obfuscate and conceal those activities by failing to maintain proper paper or electronic records, the refusal to maintain proper account records permits adverse inferences to be drawn against the offending attorney. *See Thomas,* 409 Md. at 142–43, 973 A.2d at 198 (upholding hearing judge's determination that attorney had advanced fee payments before fees had been earned, contrary to attorney's statement that he had earned those fees, because attorney produced no records to support his claim); *Attorney*

---

State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution.
Md. Rule 16–604.

*Griev. Comm'n v. Goff,* 399 Md. 1, 19, 922 A.2d 554, 565 (2007) (agreeing with lower court finding that several deficiencies in an attorney's conduct in managing his accounts, while each insufficient individually to indicate the attorney's incompetence, may support a further adverse finding of incompetence when viewed as a whole); *Attorney Griev. Comm'n v. Roberts,* 394 Md. 137, 163–64, 904 A.2d 557, 573 (2006) (finding not clearly erroneous hearing judge's conclusion that attorney delayed client payments for his own benefit even though that conclusion relied chiefly on contested evidence, because total effect of attorney's behavior demonstrated a "lack of diligence"). Here, the absence of testimonial support from Isama, Onuma, or Ngige, and of any documentary support of Respondent's claims, permitted the drawing of reasonable inferences against Respondent in favor of Bar Counsel's allegations of misconduct. *See Bereano v. State Ethics Comm'n,* 403 Md. 716, 740–46, 944 A.2d 538, 551–56 (2008) (explaining the "missing witness rule," under which adverse inferences may be drawn against a party who refuses to summon a witness whose testimony could "elucidate [a] transaction" critical to trial when the party is "peculiarly" able to summon that witness). Because of the specific, strict, and affirmative record-keeping obligations placed on attorneys in the maintenance and operation of their escrow accounts containing the trust funds of clients and third parties, the failure to maintain those records to document an attorney's claim of how and when those funds were received and expended, as well as an attorney's claimed authorization to make disbursements, may be disbelieved and an adverse inference drawn where such required corroboration is not forthcoming. Thus, we find that Respondent violated MRPC 8.4(d).

In holding that Respondent violated MRPC 8.4(c) and (d), we also conclude that Respondent correspondingly violated MRPC 8.4(a).

### B. *MRPC 1.15(a) and the Other Financial Malfeasance/Nonfeasance Violations*

 MRPC 1.15, entitled "Safekeeping Property," provides, in pertinent part:

(a) A lawyer shall hold property of clients or a third person that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account ... and records shall be created and maintained.... Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the lawyer and shall be preserved for a period of at least five years after the date the record was created.

MRPC 1.15(a). Maryland Rule 16–607, entitled "Commingling of funds," states, in part, that "[a]n attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 16–604 or permitted to be so deposited by section b. of this Rule." [11]

There is evidence demonstrating that Respondent failed to keep her earned fees and reimbursed expenses in her attorney trust account separate from her clients' and third parties' property. In addition, she made a host of deposits and received electronic transfers into her attorney trust account without any accounting. Respondent stated simply that several of these deposits were for "Ngige," who, as she told Bar Counsel and the hearing judge, was merely "somebody's name" (albeit her brother's). Moreover, Respondent commingled personal funds with her clients' monies in her attorney

---

11. The exceptions listed in section b. of Rule 16–607 are:

1. An attorney or law firm shall either (A) deposit into an attorney trust account funds to pay any fees, service charges, or minimum balance required by the financial institution to open or maintain the account ... or (B) enter into an agreement with the financial institution to have any fees or charges deducted from an operating account maintained by the attorney or law firm....

2. An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm....

3. Funds of a client or beneficial owner may be pooled and commingled in an attorney trust account with the funds held for other clients or beneficial owners.

Md. Rule 16–607. None of these exceptions are pertinent to this case.

trust account for more than four years. The $120,000, $50,000, and $349,975 deposits, none of which were explained adequately, did not belong in escrow because they were not an advancement of fees or expenses.

Furthermore, Respondent issued checks ranging in amounts from $91.25 to $24,397 to pay for her personal expenses, while other checks were written on behalf of individuals who were not her clients. She did not claim to be acting as an attorney for Ngige, and she never represented Onuma or Isama, the individuals on whose behalf she claims certain checks were issued. To the contrary, Judge Dugan found aptly that Respondent "made her attorney trust account available to them as a repository for funds collected and some type of financial exchange service." For none of these transactions did Respondent maintain complete records, as required by MRPC 1.15. As a result, Judge Dugan found that she "has no knowledge of how much money she holds in her trust account on behalf of each client." We conclude that the evidence established Respondent's egregious and intentional violations of MRPC 1.15(a) and Maryland Rule 16–607.

■ The evidence shows additionally that Respondent violated Maryland Rule 16–609 and Business Occupations and Professions Article § 10–306. Rule 16–609, entitled "Prohibited transactions," states, in pertinent part:

a. Generally. An attorney or law firm may not borrow or pledge any funds required by the Rules in this Chapter to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose.

Rule 16–609. Business Occupations and Professions Article § 10–306 provides similarly that "[a] lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer." Business Occupations and Professions Article § 10–306. Respondent violated these regulations when she used continuously trust money for purposes other than those for which her clients' monies were

designated. The evidence shows also that she disbursed a total of $134,312.85 prior to making deposits to fund those disbursements.

Respondent's four-year pattern of commingling funds and using funds to pay for personal expenses are intentional misappropriations of client and third party funds. We have viewed intentional misappropriation as "a most egregious violation even without actual loss [to the client], because the failure to keep client funds separate subjects the funds to the claims of creditors of the lawyer. The rule is concerned with the risk of loss, not only the actual loss." *Glenn*, 341 Md. at 489, 671 A.2d at 483. Although Respondent apparently did not lose a third party's or a client's funds, the risk of loss was considerable throughout her four years of shoddy record keeping, commingling, and misuse of funds.

## V. THE PROPER SANCTION

▉▉▉▉▉ As we have observed frequently, the purpose of disciplinary proceedings against an attorney is not to punish the attorney, but rather to protect the public. *Attorney Griev. Comm'n v. Cassidy*, 362 Md. 689, 698, 766 A.2d 632, 637 (2001). "The public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they are committed." *Attorney Griev. Comm'n v. Post*, 379 Md. 60, 70–71, 839 A.2d 718, 724 (2003). The aim of sanctions also is to set the standard of integrity for members of the legal profession and to demonstrate the kind of conduct the Court will not tolerate. *Attorney Griev. Comm'n v. Kahn*, 290 Md. 654, 683, 431 A.2d 1336, 1351–52 (1981).

We have considered several factors in determining an appropriate sanction. "Aggravating" factors may include:

(a) prior disciplinary offenses; (b) dishonest or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary proceedings by intentionally failing to comply with rules or orders of the disciplinary agency; (f) submission of false evidence, false

statements, or other deceptive practices during the disciplinary process; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; (j) indifference to making restitution.

*Attorney Griev. Comm'n v. Bleecker,* 414 Md. 147, 176–77, 994 A.2d 928, 945–46 (2010).

Respondent does not have a prior disciplinary record. There is evidence, however, that: (1) Respondent acted with a dishonest motive; (2) she misrepresented intentionally facts; (3) there was a "pattern of misconduct"; (4) she made no effort to rectify the consequences of her misconduct (including satisfying the civil judgment owed to Ba); (5) she has been dishonest and uncooperative with Bar Counsel; (6) she has been practicing law for more than fifteen years and ought to know that what she did (and did not do) was improper; and, (7) she has shown no remorse for her misconduct.

Judge Dugan found *no* mitigating facts. In her written exceptions, Respondent argued in mitigation that she had no prior disciplinary record (a conceded fact); that there was an absence of a dishonest or selfish motive on her part; that she was a sole practitioner who never "attended any course or training on trust account and was ignorant of the requirements of the Rule;"[12] and that there was no indication that "this violation" would be repeated. Other than the conceded absence of a prior disciplinary record, Respondent's mitigation arguments are unconvincing.[13]

---

12. We interpret Respondent's singular reference to "the Rule" in her exceptions to mean all of the rule and code sections which she was charged with violating. In any case, a practitioner of 11 to 15 years experience at the Bar (depending on which violations are considered), who mounts an "ignorance of the law" mitigation defense, wields a two-edged sword. We find here that Respondent has run onto her sword.

13. Respondent's decision to insert in the Njosa divorce decree a provision for the potential recovery of Ba's $14,500 "deposit" if the sale of the home netted sufficient funds, if it constitutes a mitigating factor at

We are not persuaded by Respondent's mitigation arguments. In fact, the evidence and findings demonstrate why the hearing judge could not have rendered mitigating findings of fact, except concerning Nwadike's prior disciplinary record. As the person with the opportunity to see and hear Respondent testify (an opportunity denied to this Court), Judge Dugan found her to be incredible and dishonest. What likelihood then is there that he also would have found absence of a selfish or dishonest motive, or a likelihood that the proven misconduct would not re-occur? In the face of the duration, frequency, and egregiousness of her mishandling of her attorney trust account, such mitigation findings would be unsupportable, arbitrary, and capricious.

The only sanction appropriate for Respondent's misconduct is disbarment. Disbarment as a sanction protects the public from being "further victimized" by the attorney. *Kahn*, 290 Md. at 683, 431 A.2d at 1351. When reviewing the attorney's conduct in *Ellison*, we held that "intentional dishonesty by a lawyer admitted to the Maryland Bar merits disbarment." 384 Md. at 716, 867 A.2d at 275.[14] Respondent's dishonest conduct in misrepresenting purposefully her power of attorney, failing to fulfill her legal duties to Ba and Njosa, and concealing purposefully the truth from the disciplinary investigation constitute the kind of intentional dishonesty that "merits disbarment." We would be remiss in the discharge of our duties to impose anything less.

---

all, is of so little consequence that it cannot begin to outweigh the gravity of the misconduct in which Respondent engaged.

**14.** Likewise, Standard 5.11 of the American Bar Association Standards for Imposing Lawyer Sanctions (1986) provides pertinently that:

Disbarment is generally appropriate when:

\* \* \*

(b) a lawyer engages in any . . . intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

Am. Bar Ass'n, Standards for Imposing Lawyer Sanctions, Standard 5.11 (1986).

Further, we have observed generally the principle that any unmitigated misappropriation of a client's or third party's funds, particularly when combined with dishonesty or misrepresentation, will result "inevitably" in disbarment. *Attorney Griev. Comm'n v. Hayes,* 367 Md. 504, 512, 789 A.2d 119, 124 (2002). *See also Vanderlinde,* 364 Md. at 413–14, 773 A.2d at 484–85 (finding that "in cases of intentional dishonesty, misappropriation cases, fraud, . . . and the like, we will not accept, as 'compelling extenuating circumstances,' anything less than the most serious and utterly debilitating mental or physical health conditions"); *Attorney Griev. Comm'n v. Bernstein,* 363 Md. 208, 227, 768 A.2d 607, 617 (2001) (warning that " '[a]ppropriating any part of [trust account] funds to [an attorney's] own use and benefit without clear authority to do so cannot be tolerated' " (quoting *Attorney Griev. Comm'n v. Owrutsky,* 322 Md. 334, 345, 587 A.2d 511, 516 (1991))); *Attorney Griev. Comm'n v. Tomaino,* 362 Md. 483, 498, 765 A.2d 653, 661 (2001) (reaffirming our often-repeated principle that " 'misappropriation of funds by an attorney is an act infested with deceit and dishonesty' " that ordinarily merits disbarment (quoting *Attorney Griev. Comm'n v. Sheridan,* 357 Md. 1, 27, 741 A.2d 1143, 1157 (1999))); *Attorney Griev. Comm'n v. Williams,* 335 Md. 458, 474, 644 A.2d 490, 497 (1994) (same). An attorney who intentionally misappropriates funds entrusted to him or her acts in a way that is "infected with deceit and dishonesty and, in the absence of compelling extenuating circumstances justifying a lesser sanction, [the misappropriation] will result in disbarment." *Attorney Griev. Comm'n v. Spery,* 371 Md. 560, 568, 810 A.2d 487, 491–92 (2002). This is certainly not the case in which we should back away from or side step this principle.

The evidence shows that Respondent misappropriated purposefully, rather than merely mishandled negligently, her clients' and third parties' funds. Although Respondent's record-keeping might be categorized generously by some as merely careless, her misuse of funds in her attorney trust account for personal expenses, her failure to deposit the refund check from Talcott, and her commingling of funds

constitute intentional misappropriations of funds entrusted to her. Respondent's misuse of client funds was a misrepresentation to her clients that their monies were secure in her trust account.

The aim of protecting the public is particularly important in cases of dishonesty, intentional misappropriation, and fraud, where this Court's "primary function always is to protect the public, *not attorneys*." *Vanderlinde*, 364 Md. at 388, 773 A.2d at 470. Respondent was not merely negligent, but intentional, in her misrepresentations and misappropriation of client and third-party funds, and her misconduct falls well below the attorney's standard of "complete trust and confidence." *Id.* at 390, 773 A.2d at 471. For these reasons, and because there are no "extenuating circumstances justifying a lesser sanction," the only appropriate sanction for Respondent is disbarment. *Spery*, 371 Md. at 568, 810 A.2d at 491–92.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST OZOEMENA MARYROSE NWADIKE; MANDATE TO ISSUE FORTHWITH.**

BELL, C.J., and MURPHY, J., Concur and Dissent.

MURPHY, J., which BELL, C.J. joins.

If I were persuaded by clear and convincing evidence that Respondent was not authorized by Mr. Onuma to use his funds to remove Mr. Njosa's property from foreclosure, I would hold that disbarment is the appropriate sanction. I would, however, sustain Respondent's exception to the hearing judge's finding that Respondent did not have Mr. Onuma's authorization. Although I am by no means persuaded that there was such an authorization, in *Attorney Grievance Comm'n v. Clements*, 319 Md. 289, 572 A.2d 174 (1990), this Court stated:

A refusal to believe evidence of a respondent, however, does not, of itself, supply affirmative evidence of the dishonesty,

fraud, deceit or misrepresentation charged. The issue is whether Bar Counsel presented sufficient evidence of the charge to meet the clear and convincing standard of proof. *Id.* at 298, 572 A.2d at 179. In my opinion, Bar Counsel simply did not meet its burden of persuasion on this issue.

I would also hold that four mitigating circumstances have been established by a preponderance of the evidence. First, although Respondent did not have an "executed" power of attorney signed by Mr. Njosa, she was his attorney of record in Circuit Court proceedings when she signed the contract on his behalf. Second, Respondent did make an effort to protect Mr. Ba's deposit by requesting that Mr. and Mrs. Njosa's October 7, 2003 Judgment of Absolute Divorce include a provision that afforded Mr. Ba the opportunity to obtain reimbursement of his "good faith payment." Third, Respondent does not have a prior disciplinary record. Fourth, the hearing judge was not clearly erroneous in finding that Respondent did not commit a theft of Mr. Ba's money. During the closing argument of Respondent's counsel, the hearing judge stated:

> I don't believe your client stole the money, if that's what you're talking about, if that's what you're trying to defend her from. Although Mr. Bolly Ba's probably trying to make it look like that when he testified, I don't believe she did that.

As to the appropriate sanction, it is clear that Respondent has not made timely good faith efforts to rectify the consequences of her misconduct, and she has not made full and free disclosure to Bar Counsel. While Respondent has violated Rule 1.15(a), I am not persuaded by clear and convincing evidence that Respondent actually stole any client's money or property. As stated above, Respondent did make an effort— albeit an inadequate one—to protect Mr. Ba's interest, and the hearing judge expressly found that Respondent never intended to steal Mr. Ba's money.

From my evaluation of the facts and circumstances of the case at bar, I agree with the majority that Respondent's

violations are too serious to justify a suspension for a brief period of time. I am persuaded, however, that disbarment is too harsh a sanction. This Court should not reject the possibility that Respondent may at some point in the future persuade us that she is once again fit to practice law in Maryland. I would therefore hold that, at this point in time, an indefinite suspension is required to protect the public interest.

Chief Judge BELL has authorized me to state that he joins in this concurring and dissenting opinion.