12 A.3d 105

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Walter Carroll ELLIOTT, Jr.**

**Mic. Docket AG No. 36, Sept. Term, 2009.**

Court of Appeals of Maryland.

Jan. 24, 2011.

Glenn M. Grossman, Bar Counsel (Atty. Grievance Commission of Maryland), for petitioner.

Andrew Jay Graham, Esq. of Kramon, Graham, P.A., Baltimore, MD, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, and BARBERA, JJ.

MURPHY, J.

On September 15, 2009, the Attorney Grievance Commission of Maryland, Petitioner, filed a "PETITION FOR DISCIPLINARY OR REMEDIAL ACTION" against Walter Carroll Elliott, Jr., Respondent. On that same day, this Court ordered that the charges against Respondent "be heard and

determined by Judge Vicki Ballou–Watts of the Third Judicial Circuit [ (the Hearing Judge) ], in accordance with Maryland Rule 16–757[.]" The Hearing Judge filed "FINDINGS OF FACT AND CONCLUSIONS OF LAW" in which she concluded that Respondent violated Rules 1.2, 1.4, 1.15, 8.1, 8.4(a)(b)(c) and (d) of the Maryland Rules of Professional Conduct (MRPC), and Section 10–306 of the Business Occupations and Professions Article of the Maryland Code (BO).[1] Respondent has noted thirteen exceptions to those Findings and Conclusions. For the reasons that follow, this Court overrules every one of Respondent's exceptions, and concludes that Respondent's disbarment is required to protect the public interest.

## Background

MRPC 1.2, in pertinent part, requires that a lawyer "abide by a client's decisions concerning the objectives of the representation and, when appropriate, [ ] consult with the client as to the means by which they are to be pursued." MRPC 1.4(a)(1) requires that a lawyer inform his or her client of any "circumstance" that requires the client's "informed consent." MRPC 1.15, in pertinent part, requires that a lawyer comply with the safekeeping and record keeping requirements of Title 16, Chapter 600 of the Maryland Rules when the lawyer is holding funds that have been entrusted to the lawyer by a client. MRPC 8.1(a) prohibits a lawyer from knowingly making a false statement of material fact "in connection with a disciplinary matter[.]" BO § 10–306 prohibits a lawyer from using funds entrusted to him or her "for any purpose other than the purpose for which the trust money is entrusted to the lawyer."

MRPC 8.4, in pertinent part, provides:

It is professional misconduct for a lawyer to:

---

**1.** The Hearing Judge concluded that each of the violations had been proven by "clear and convincing evidence."

(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice[.]

The Hearing Judge's Findings and Conclusions included the following numbered paragraphs:

2. On March 12, 2008, Respondent signed an Employment Contract with the law firm of Macey & Aleman, also known as "Legal Helpers, P.C.," which identified itself as "America's Largest Consumer Bankruptcy Firm." Under the terms of the contract, Respondent was hired to serve as the managing attorney for the firm's Maryland consumer bankruptcy practice. At the time Respondent was hired, the firm had two offices with three additional employees—an attorney, a law clerk and a receptionist. One office was located in Greenbelt, Maryland. The second office was located in Baltimore, Maryland.

\* \* \*

4. Respondent's duties included interviewing prospective bankruptcy clients, providing legal advice regarding consumer bankruptcy matters, preparing and filing bankruptcy petitions, and attending hearings associated with clients' bankruptcy cases. As the managing attorney for the firm's Maryland offices, Respondent was also responsible for accounting for all client payments and trustee checks received. He was expected to forward all payments to the firm's office in Chicago, Illinois on a weekly basis.

\* \* \*

8. At all relevant times herein, Kevin Van Hout, Esquire was the firm's regional managing attorney. Shobhanna Katsuri, Esquire was one of the firm's four partners. Ms. Katsuri's office was located in Chicago, Illinois. Respondent reported to both attorneys.

\* \* \*

11. Evangeline Arcilla attended the June 17, 2008 appointment between Gary Magsalin and Respondent. Mr. Magsalin is Ms. Arcilla's brother. Ms. Arcilla did not have a scheduled appointment.

\* \* \*

14. At the time of the June 17, 2008 meeting with Mr. Magsalin, Respondent also discussed with Ms. Arcilla her financial concerns and advised her of her legal rights. Mr. Magsalin encouraged Ms. Arcilla to file a Chapter 7 Bankruptcy Petition.

15. On June 17, 2008, Evangeline Arcilla executed a "Macey & Aleman—Chapter 7 Contract." Respondent signed the contract on behalf of the firm.

16. Under the terms of the contract, Ms. Arcilla agreed to pay Macey & Aleman a "flat fee, earned upon receipt, court costs, and optional due diligence product costs ... prior to the filing of the bankruptcy petition." The contract also states that before filing, Ms. Arcilla "will provide $299.00 for the filing fee and $274.00 for the due diligence products." In the contract, these amounts were denoted as costs separate from any attorney's fees.

17. At the time of the June 17, 2008 meeting, Ms. Arcilla made a $20.00 cash payment to Respondent. The Respondent utilized the firm's cash receipt book to issue a written receipt to Ms. Arcilla for her $20.00 payment. Ms. Arcilla also gave Respondent a copy of three (3) credit card bills.

18. The Respondent signed the receipt, noting that the $20.00 payment was for "Retainer Fees." Respondent

also noted that Ms. Arcilla's balance was $1,454.00. Below the balance due figure on the receipt was written: "[*tff (299* "]. Ms. Arcilla's Chapter 7 contract required payment of $99.00 for filing fees before the bankruptcy petition would be filed.

\*       \*       \*

20. During the June 17, 2008 meeting, Respondent gave Ms. Arcilla an envelope addressed to the new Macey & Aleman office location at 809 Glen Eagle's Court in Towson, Maryland and instructed her to make a check for the balance due. Respondent also instructed Ms. Arcilla to send a note with the check indicating that she was referred to the firm by Mr. Magsalin so that he (Magsalin) would receive a $50.00 credit on the balance of his flat fee to the firm.

21. Portia Tidwell, a Towson University student, was employed by the law firm as a legal assistant/office manager from July 2, 2008 through the end of October 2008.

22. On July 2, Ms. Arcilla issued a check in the amount of $1,454.00 made payable to Macey & Aleman. She also wrote a note stating that she was referred to Respondent by Gary Magsalin.

23. Ms. Arcilla's check and note arrived at the firm's Towson office between July 2, 2008 and July 15, 2008. Ms. Tidwell opened the mail and checked the firm's database for an account under Ms. Arcilla's name.

24. When Ms. Tidwell was unable to locate Ms. Arcilla's name in the firm's database, she presented the check to Respondent. Respondent told Ms. Tidwell that Ms. Arcilla was his client and that he was going to represent her after he left he law firm.

25. Respondent applied white out to the check and changed the payee from "Macey & Aleman" to "Walter Elliott, Jr., Esq."

26. During all relevant times herein, Ms. Arcilla's telephone contact numbers were: (Home) [ ] and (Cell) [ ]. Telephone records reflect that there were no telephone calls between Respondent and Ms. Arcilla during the time period from July 2, 2008 to July 15, 2008.

27. Respondent testified that upon receipt of the check, he immediately placed a telephone call to Ms. Arcilla. He said that he used the office telephone. According to Respondent, he spoke with Ms. Arcilla, advised her of the mistake and asked if she wanted him to change the payee or return the check to her for reissue in his name. Respondent testified that Ms. Arcilla authorized him to substitute his name as payee. Respondent has acknowledged that he altered the check by using "white out" to change payee names.

28. Ms. Tidwell testified that she was present when Respondent purportedly spoke with Ms. Arcilla. She could not hear what the person on the other end of the call said. However, she testified that when the telephone call ended, she saw Respondent "scratch out" the firm name and insert Respondent's name on the check.

29. The testimony of Respondent and Ms. Tidwell regarding the aforementioned telephone call and Ms. Arcilla's authorization is not credible. Ms. Arcilla testified that she did not talk to respondent during the relevant time period and did not give him permission to alter her check. A review of the law firm's certified telephone records (and Respondent's cell phone records) for the time period from July 2, 2008 through July 15, 2008, show no calls to Ms. Arcilla and thus corroborate her testimony. In addition, Ms. Tidwell's description of how the check was altered contradicts the description acknowledged by Respondent.

As a result, this court finds that Ms. Arcilla did not authorize Respondent to substitute his name as payee on the aforementioned check.

30.  In June, 2008, Respondent complained to Ms. Katsuri and Mr. Van Hout about the high volume of cases and the need for more attorneys, support staff and supplies.  They discussed increasing his salary and obtaining more support.  However, the only additional employees hired were Ms. Tidwell (July 2, 2008) and an associate attorney who began working for the firm in the latter part of July 2008.  Respondent's salary was not increased.  In June, Respondent explored the possibility of starting his own firm or sharing office space with another attorney.  In early to mid July 2008, Respondent became "angry" with the firm and decided that he wanted to terminate his employment relationship with the firm.

31.  On July 15, 2008, Respondent deposited Ms. Arcilla's check into his personal bank account with USAA Federal Savings Bank [ ]. The bank account did not identify the accountholder as an Attorney at Law or Law Office, nor was it designated as an Attorney Trust Account or Attorney Escrow Account.

32.  Respondent deposited Ms. Arcilla's check together with two additional checks for a total deposit of $4,484.63.  The account balance immediately prior to the July 15, 2008 deposit was $398.26.

33.  On August 1, 2008, Respondent transferred $4,384.83 from the USAA Federal Savings Bank Account to another personal bank account with Bank of America. As a result of the transfer, respondent's remaining balance in the USAA Federal savings Bank account was $500.00.

34.  On August 1, 2008, during a telephone conference call, respondent advised Ms. Katsuri and Mr. Van Hout that he intended to resign.  On August 3, 2008, respondent gave the firm the required written sixty (60) day notice of his resignation by email.  Respondent continued to work full time as managing attorney for the firm's Maryland offices.

35. During August 2008, Ms. Arcilla called Respondent several times to discuss the status of her case. Respondent told Ms. Arcilla that he had worked on her case, but that she needed to forward documents to him and take a credit counseling course before the Chapter 7 bankruptcy petition could be filed.

36. On August 29, 2008, an Express Mail package from Ms. Arcilla was addressed to Respondent and delivered to the law firm's Towson office. The package contained documents Respondent had requested in order to process the bankruptcy petition.

37. Ms. Arcilla called Respondent again on September 3, 2008, and the two exchanged calls on September 10, 2008 and September 17, 2008. The last telephone conversation between Respondent and Ms. Arcilla occurred on September 17, 2008 for a duration of five (5) minutes.

38. On September 22, 2008, Ms. Arcilla called the law firm's 800 number to complain about the handling of her case. She had also learned that Respondent was leaving the firm. She subsequently spoke to the firm's regional managing attorney, Kevin Van Hout, who asked her to forward a copy of the cancelled check, executed contract with the law firm and other papers related to her case.

39. On or about September 23, 2008, after speaking with Ms. Arcilla and receiving the documents she provided, Mr. Van Hout confronted Respondent and terminated this employment with the firm. The termination was effective the same day.

40. On September 24, 2008, Respondent obtained a money order in the amount of $1,454.00. He delivered the money order and Ms. Arcilla's documents to Mr. Van Hout. The money order represents the total amount Respondent collected from Ms. Arcilla in cash on June 17, 2008 and by check in July, 2008.

\* \* \*

42. During the Commission investigation of Mr. Van Hout's complaint, Respondent, through his attorney, advised Bar Counsel that he (Respondent) was in the process of leaving the firm when he met Mr. Magsalin and Ms. Arcilla on June 17, 2008. According to Respondent, he explained to Ms. Arcilla that he would charge her the same flat fee ($1,454.00) that the firm charged Mr. Magsalin. Respondent explained that he "agreed to handle Ms. Arcilla's matter on his own once he left Macey & Aleman and established his own practice (or affiliated with a new law firm)." He also advised Bar Counsel that after he received the $1,454.00 check in July, he called Ms. Arcilla and received permission to substitute his name on the check made payable to Macey & Aleman. In addition, Respondent told Bar Counsel that "on July 3, 2008, prior to receiving the check, [he] called Kevin Van Hout to inform him of his decision to resign."

43. During the hearing before this court, Respondent testified, in pertinent part, that on June 27, 2008, Ms. Arcilla retained him (not Macey & Aleman) and that he charged her a flat "fee" of $1,454.00 for a Chapter 7 filing. According to Respondent, the fee agreement was better than the amount charged by the law firm because his "fee" *included* the court filing fees ($299.00). He also testified that although the law firm utilized "Best Case" software to prepare bankruptcy cases, he also owned the same software and used it to prepared Ms. Arcilla's petition. Respondent testified that he performed work on her Chapter 7 case and completed everything he could by June 25, 2008. According to Respondent, all that remained before filing the petition in court was for Ms. Arcilla to forward the requested documents to his office and complete the required credit counseling course. In addition, as noted, he testified that after he received the $1,454.00 check in July, he called Ms. Arcilla and she authorized

him to substitute this name as the payee on the aforementioned check.

44. Respondent never sent to Ms. Arcilla any written confirmation that would support his claim that he (as opposed to the law firm) was retained to handle her Chapter 7 bankruptcy case.

45. During the hearing Respondent testified that in June he talked with the law firm's managing partners and complained about the lack of additional attorneys and support staff as noted under Paragraph 30 herein. In early to mid July, he became "angry" with the firm's lack of progress in addressing his concerns and decided to leave the firm. However, he did not notify the firm of his intention to resign until August 1, 2008, which is contrary to the representations Respondent made to Bar Counsel during the investigation of Mr. Van Hout's complaint.

(Emphasis in original. Footnotes omitted).

The Hearing Judge found that Respondent violated MRPC 1.2 in two ways: (1) "he failed to abide by Ms. Arcilla's decision to retain the law firm of Macey & Aleman to represent her in Chapter 7 bankruptcy proceedings[,]" and (2) "he took action on Ms. Arcilla's behalf that she did not authorize when he substituted his name and payee on a check made payable to Macey & Aleman."

The Hearing Judge found that Respondent violated MRPC 1.4(a)(1) in two ways: (1) "he made a unilateral decision to make Ms. Arcilla his personal client although she had entered into a written agreement to retain the law firm of Macey & Aleman[,]" and (2) he decided "to change the check payee from 'Macey & Aleman' to 'Walter Elliott, Jr. Esq.' without discussing the change and obtaining Ms. Arcilla's consent[.]"

The Hearing Judge found that Respondent violated MRPC 1.15 in five ways: (1) failing to enter Ms. Arcilla's name into the firm's database, (2) failing to record her retainer payment, (3) failing to forward that payment to the firm's Chicago office, (4) substituting his name as payee on the check that Ms.

Arcilla issued to the firm, and depositing that check in his personal account, and (5) failing to "relinquish the funds [deposited in his personal account] to the firm until after he was confronted by [Mr.] Van Hout."

The Hearing Judge found that Respondent violated MRPC 8.1(a) in two ways: (1) "he represented to Bar Counsel that Ms. Arcilla had retained him personally (as opposed to Macey & Aleman) when he knew that Ms. Arcilla had executed a written contract with the law firm and he had signed the same contract on behalf of the law firm[,]" and (2) "he misrepresented to Bar Counsel that Ms. Arcilla had authorized him to change the payee on the check issued to the law firm."

The Hearing Judge found that Respondent violated BO § 10–306 when he "intentionally breached [his fiduciary] duties and obligations [to Ms. Arcilla and to his employer] by misappropriating funds and placing them in personal accounts for his own use and benefit when he knew the funds belonged to the law firm."

The Hearing Judge found that Respondent violated Sections (a), (b), (c), and (d) of MRPC 8.4 when he (1) "intentionally took funds belonging to the firm and placed those funds in his personal bank account[,]" (2) "comingled the funds with his own personal funds and later transferred a portion of the funds to another personal bank account . . . without the knowledge or consent of the client or the law firm to whom the funds belonged[,]" (3) "failed to advise the law firm of either payment [made by Ms. Arcilla,]" and (4) "did not relinquish the funds to the firm until after he as confronted by [Mr.] Van Hout."

The Hearing Judge also found that, although "Respondent has failed to offer any evidence of compelling extenuating circumstances[,]" Respondent established three "matters of mitigation" by a preponderance of the evidence:

1.  The complaint [in the case at bar] was the only disciplinary matter filed against Respondent since his admission to the Maryland Bar on December 17, 2002.

2. The Respondent paid the law firm the entire amount he received from Mr. Arcilla ($1,474.00) the day after he was confronted by the firm's regional managing attorney[.]

3. The Respondent's position with the firm was his first full-time employment as a practicing attorney.

As stated above, the Respondent has noted thirteen exceptions to the Hearing Judge's findings and conclusions.

## Standard of Review

In *Attorney Grievance Comm'n v. Ugwuonye*, 405 Md. 351, 952 A.2d 226 (2008), this Court stated:

"This Court has original and complete jurisdiction over attorney discipline proceedings" in Maryland. *Attorney Grievance Comm'n v. Adams*, 349 Md. 86, 93, 706 A.2d 1080, 1083 (1998). Even though conducting an independent review of the record, we accept the hearing judge's findings of fact unless they are found to be clearly erroneous. *Attorney Grievance Comm'n v. Zdravkovich*, 375 Md. 110, 126, 825 A.2d 418, 427, (2003). This Court gives deference to the hearing judge's assessment of the credibility of witnesses. *Id.* Factual findings by the hearing judge [that the Commission has satisfied its burden of persuasion] will not be interfered with if they are founded on clear and convincing evidence. *Attorney Grievance Comm'n v. Monfried*, 368 Md. 373, 388, 794 A.2d 92, 100 (2002). All proposed conclusions of law made by the hearing judge, however, are subject to *de novo* review by this Court. *Attorney Grievance Comm'n v. O'Toole*, 379 Md. 595, 604, 843 A.2d 50, 55 (2004).

*Id.* at 368, 952 A.2d at 235–36.

In *Attorney Grievance Commission v. Walter*, 407 Md. 670, 967 A.2d 783 (2009), this Court stated:

[I]n its assessment of the credibility of witnesses, the hearing judge was entitled to accept—or reject—*all, part,* or *none* of the testimony of any witness, including testimony that was not contradicted by any other witness. In making

the finding of fact "that Respondent did not intend to cheat or deceive either his client or his firm," the hearing judge was entitled to draw reasonable inferences from the facts that the judge found to be true. "There are few facts, including even ultimate facts, that cannot be established by inference." *Moore v. State*, 73 Md.App. 36, 45, 533 A.2d 1, 5 (1987).

> There is nothing mysterious about the use of inferences in the fact-finding process. Jurors routinely apply their common sense, powers of logic, and accumulated experiences in life to arrive at conclusions from demonstrated sets of facts.

*Robinson v. State*, 315 Md. 309, 318, 554 A.2d 395, 399 (1989). Hearing judges do the very same thing.

The hearing judge's finding ... was not erroneous—clearly or otherwise—merely because she did not find it appropriate to draw one or more "permissible inferences which might have been drawn from the evidence by another trier of the facts." *Hous. Opportunities Comm'n of Montgomery County v. Lacey*, 322 Md. 56, 61, 585 A.2d 219, 222 (1991).

*Id.* at 678–79, 967 A.2d at 788.

## Discussion

### I.

In his first exception, Respondent argues that the finding in paragraph 28 is "misleading and incomplete." There would be merit in this argument only if the Hearing Judge were required to credit the testimony of Respondent and Ms. Tidwell.

In his second exception, Respondent argues that the finding in paragraph 29 is "factually incorrect." Having applied the required standard of review to this exception, we reject this argument.

In his third exception, Respondent argues that the finding in paragraph 30 incorrectly implies that he was "angry" because his salary was not increased, when he was in fact angry that his employer ignored his "fair criticisms." The

Hearing Judge was entitled to (1) accept Respondent's testimony that he was angry, (2) reject Respondent's explanation for *why* he was angry, and (3) draw the permissible inference that Respondent was angry about his salary.

In his fourth exception, Respondent argues that the findings in paragraph 48 were erroneous because Respondent had made statements prior to August 1, 2008 in which he notified supervisors that "things were not working out," and that he "would be out the door" if the firm did not hire additional staff. Neither of those statements, however, is a declaration of intent to resign.

In his fifth exception, Respondent argues as follows:

> Respondent excepts to the trial court's finding that Ms. Arcilla did not authorize Respondent to change her check's payee, and to the trial court's implicit finding that Respondent did not believe that he had authority to make himself the payee.

Having applied the required standard of review to this exception, we reject this argument.

In his sixth exception, Respondent argues that "Rule 1.2 is simply inapplicable to the facts at hand." In his seventh exception, Respondent argues that, "Rule 1.4 is inapplicable to the facts of this case." There would be merit in these arguments only if the Hearing Judge were required to credit the testimony of Respondent and reject the testimony of Ms. Arcilla.

In his eighth exception, Respondent argues that he did not violate MRPC 1.15 because he was not required to place Ms. Arcilla's fee payment "in an escrow account for safekeeping." The record shows, however, that the Hearing Judge found that Respondent violated this rule in five ways, including the violation that occurred when (in the words of the Hearing Judge) "Respondent substituted his name as payee [on the check that Ms. Arcilla issued to the firm] and deposited the funds in his personal account with USAA Federal Savings Bank."

In his ninth exception, Respondent argues that his representation to Bar Counsel that Ms. Arcilla had retained him "personally" did not constitute a violation of MRPC 8.1, and that the Hearing Judge was "clearly erroneous in finding that Respondent did not believe that Ms. Arcilla had authorized him to alter the check[.]" Having applied the required standard of review to this exception, we reject this argument.

In his tenth exception, Respondent argues that the Hearing Judge was "clearly erroneous" in finding that Respondent had violated MRPC 8.4. According to Respondent (in the words of his exception), "it is clear that Respondent honestly believed that Ms. Arcilla had agreed to be his personal client and had authorized him to be paid the fee, and that he had a right to represent her on his own." There would be merit in this argument only if the Hearing Judge were required to credit the testimony of Respondent and reject the testimony of Ms. Arcilla.

In his eleventh exception, Respondent argues that Petitioner's evidence was insufficient to establish that Respondent violated BO § 10–306 because Ms. Arcilla's payment was a "flat fee, earned upon receipt." The Hearing Judge, however, was not clearly erroneous in finding that Respondent violated this statute when he "intentionally breached [his fiduciary] duties and obligations [to Ms. Arcilla and to his employer] by misappropriating funds and placing them in personal accounts for his own use and benefit when he knew the funds belonged to the law firm."

Respondent's twelfth and thirteenth exceptions are as follows:

*Exception No. 12.* The Respondent excepts to the [Hearing Judge's] failure to find that Respondent honestly believed that he had made it clear to Ms. Arcilla, prior to depositing her check for legal fees, that he would be leaving the Firm and that he personally, not Macey & Aleman, would be representing her, and that to the extent that Ms. Arcilla disputed this, it was likely the result of an innocent failure on her part to comprehend what [Respondent] told her.

*Exception No. 13:* The Respondent excepts to the [Hearing Judge's] failure to find that Respondent did not change the name of the payee of Ms. Arcilla's check with any improper intent.

From our review of the record, however, we reject Respondent's arguments that (1) "[t]he evidence clearly supports the conclusion that, at worst, there was a misunderstanding between Respondent and Ms. Arcilla, with Ms. Arcilla believing that her check was supposed to be paid to the Firm and [Respondent] believing that she had authorized him to accept the money because he personally would be handling her case while he remained at the Firm and thereafter[,]" and (2) "the evidence clearly supports a finding that [Respondent] did not act with any improper intent."

For the reasons stated above, we overrule each of Respondent's exceptions, and must determine the appropriate sanction for the violations that have been proven.

## II.

This Court has repeatedly stated "that each attorney grievance case rests on its own merits." *Attorney Grievance Comm'n v. Garcia,* 410 Md. 507, 529, 979 A.2d 146, 159 (2009). In determining the appropriate sanction, this Court has recognized as a "mitigating factor" (1) the absence of a prior disciplinary record, (2) good faith efforts to make restitution, and (3) inexperience in the practice of law. *Attorney Grievance Comm'n v. Gordon,* 413 Md. 46, 63, 991 A.2d 51, 61 (2010), (quoting *Attorney Grievance Comm'n v. Sweitzer,* 395 Md. 586, 599, 911 A.2d 440, 448 (2006)). Although we are required to consider the three mitigating factors found by the Hearing Judge,[2] it is our duty to impose the appropriate

---

**2.** As this Court noted in *Palmer,* even if mitigating factors do not constitute "compelling extenuating circumstances" that would warrant a sanction other than disbarment, those factors may well become relevant "should Respondent seek to be readmitted to the Bar." 417 Md. at 215, n. 16, 9 A.3d at 55, n. 16.

sanction on an attorney who has violated MRPC 1.2, 1.4, 1.15, 8.1, 8.4(a), (b), (c) and (d), and BO 10–306.

> Misappropriation of funds by an attorney is an act infected with deceit and dishonesty and ordinarily will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction. . . . The sanction of disbarment is so justified because attorneys are charged with remembering that the entrustment to them of the money and property of others involves a responsibility of the highest order. They must carefully administer and account for those funds. Appropriating any part of those funds to their own use and benefit without clear authority to do so cannot be tolerated.

*Attorney Grievance Comm'n v. Roberts,* 394 Md. 137, 166, 904 A.2d 557, 574–75 (2006) (internal citations and quotation marks omitted). In *Attorney Grievance Comm'n v. Palmer,* 417 Md. 185, 9 A.3d 37 (2010), this Court stated:

> It has long been settled that "misappropriation by an attorney of funds of others entrusted to his care, be the amount small or large, is of great concern and represents the gravest form of misconduct." *Thomas,* 409 Md. at 175, 973 A.2d at 218 (quoting *Attorney Grievance Comm'n v. Pattison,* 292 Md. 599, 609, 441 A.2d 328, 333 (1982)). Accordingly, when an attorney of this State commits the grievous act of misappropriating funds, "particularly when combined with dishonesty or misrepresentation, [it] will result 'inevitably' in disbarment." *Attorney Grievance Comm'n v. Nwadike,* 416 Md. 180[, 6 A.3d 287] (2010).

*Id.* at 206–07, 9 A.3d at 50.

■ Under *Palmer,*[3] and *Attorney Grievance Comm'n v. Ezrin,* 312 Md. 603, 609, 541 A.2d 966, 969 (1988), the mitigat-

---

3. Although *Palmer* and *Ezrin* involved numerous acts of misconduct, the mitigating factors in *Ezrin* included the respondent's "stellar reputation as an attorney, his general good character, the lack of prior disciplinary actions, the restitution made to his law partners, and his cooperation with bar counsel." 312 Md. at 609, 541 A.2d at 969. The mitigating factors in *Palmer* included the fact that the respondent (1)

ing factors found by the Hearing Judge do not constitute "compelling extenuating circumstances . . . that would warrant a sanction other than disbarment." As this Court stated in *Palmer, supra:*

> This Court has long held that "when a member of the bar is shown to be willfully dishonest for personal gain by means of fraud, cheating, or like conduct, absent the most compelling extenuating circumstances, disbarment follow[s] as a matter of course." *Md. State Bar Assoc. v. Agnew,* 271 Md. 543, 553, 318 A.2d 811, 817 (1974). Having been presented with no sufficient "compelling extenuating circumstances," we hold that the appropriate sanction is disbarment.

*Id.* at 216, 9 A.3d at 55.

For the above stated reasons, Respondent is hereby disbarred.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST WALTER CARROLL ELLIOTT, JR.**

---

had no previous disciplinary record, (2) was "well-regarded in both the legal and general communities," and (3) "cooperated fully with bar counsel in the investigation and prosecution of [that] case." 417 Md. at 214, 9 A.3d at 55.